# IN RE KAMARI C-L. ET AL.*
## (AC 31327)

Bishop, Alvord and Schaller, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued April 19—officially released July 27, 2010

*Benjamin D. Hollander*, for the appellant (respondent mother).

*Cynthia Mahon*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Inez M. Diaz Galloza*, for the minor children.

*Opinion*

BISHOP, J. The respondent mother[1] appeals from the judgments of the trial court finding her children, Kamari

---

[1] The respondent father of the two minor children at issue in this appeal also was named in the neglect petitions that commenced this case. Because

and Kamarion, neglected pursuant to General Statutes § 46b-120 (9) (B) and (C)[2] and committing them to the custody of the petitioner, the commissioner of children and families. On appeal, the respondent claims that (1) there was insufficient evidence to support the adjudication of neglect, and (2) the court improperly ordered the children committed to the care and custody of the petitioner.[3] In response, the petitioner claims that the respondent's appeal should be dismissed as moot because, after the court's adjudication of neglect and commitment of the children to the petitioner, the court denied the respondent's motion to revoke the commitment. We conclude that the respondent's appeal is not moot and affirm the judgments of the trial court.

The following facts and procedural history are relevant to our resolution of the respondent's appeal. Although the respondent is the mother of three children, this appeal concerns her two youngest children, Kamari and Kamarion.[4] On May 7, 2008, the petitioner filed a neglect petition, claiming that Kamari was being denied

he has not appealed, we refer in this opinion to the respondent mother as the respondent.

[2] We note that § 46b-120 was amended by Public Acts, Spec. Sess., June, 2007, No. 07-04, § 73, which took effect January 1, 2010. The act did not change any substantive language regarding the definition of "neglect"; however, the subdivision in which the definition is located changed from subdivision (9) to subdivision (8). References in this opinion to § 46b-120 (9) are to the revision of the statute that was applicable prior to the 2007 amendments.

[3] The attorney for the minor children also filed a brief in this appeal. Counsel for the children does not dispute the neglect finding but challenges the court's commitment of the children to the care and custody of the petitioner. The claims asserted by the attorney for the minor children will be discussed in conjunction with those made by the respondent.

[4] Although this appeal concerns only Kamari and Kamarion, the trial court took judicial notice of the facts pertaining to a prior termination of parental rights proceeding concerning the respondent's eldest child, Keyashia C. On August, 5, 2008, the respondent's parental rights as to Keyashia were terminated; the respondent appealed, and this court affirmed the judgment of the trial court. See *In re Keyashia C.*, 120 Conn. App. 452, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).

proper care and attention and being permitted to live under conditions injurious to his well-being. On July 14, 2008, the petitioner invoked a ninety-six hour hold; see General Statutes § 17a-101g; and removed Kamari from the care and custody of the respondent and on July 16, 2008, filed an ex parte motion for an order of temporary custody of Kamari, which was granted. Following a contested hearing, the court, *Graziani, J.*, sustained the order of temporary custody.[5]

On September 16, 2008, three days after the respondent gave birth to her third child, Kamarion, the petitioner filed a neglect petition and an ex parte motion for an order of temporary custody regarding Kamarion on the basis of the doctrine of predictive neglect. The ex parte motion was granted, and Kamarion was removed from the care and custody of the respondent. On October 14, 2008, following a contested hearing, the court, *Esposito, J.*, vacated the order of temporary custody regarding Kamarion. The court found that the petitioner had failed to establish that Kamarion was in immediate physical danger and returned Kamarion to the care and custody of the respondent, with whom he remained pending disposition of the neglect petition.

On February 10 and 13 and March 6, 2009, a trial was held before the court, *Wilson, J.*,[6] regarding the neglect petitions as to both children. The court made the following findings of fact. The respondent has a history with the department of children and families (department) that began in 2005, relating to her inability to care properly for her eldest child, Keyashia C. This prior history was relevant to the present case because the respondent's mental health, substance abuse and transiency

---

[5] The father did not appear for any of the proceedings. He was defaulted on the neglect petitions regarding Kamari and Kamarion on June 11 and October 29, 2008, respectively.

[6] The memorandum of decision dated July 20, 2009, mistakenly states that the trial took place only on February 13, 2009, and March 6, 2009.

issues that were evidenced in the earlier termination proceeding were found by the court to have continued and to be germane to her care of her two younger children. From 2005 to 2006, the respondent was provided a number of services to help her address her issues, with the goal being to reunite her with Keyashia. Because, however, she failed to achieve a sufficient degree of personal rehabilitation in a timely fashion and failed to demonstrate that within a reasonable time she could assume a responsible position in the life of the child, her parental rights as to Keyashia were terminated. See General Statutes § 17a-112 (j) (3) (B). At the time of the termination, the court, *Brown, J.*, noted that the respondent had a sincere desire to care for Keyashia but that she was unable to demonstrate consistent follow-through and compliance with the services. Similarly, the court, *Wilson, J.*, in the case at hand, found that the respondent's inability to follow through has continued to be an issue implicating her care of her two younger children.

The court found that the respondent has had difficulty maintaining stable housing. In 2007, the department referred her to the supportive housing program (program), which assisted her in obtaining a two bedroom apartment.[7] The respondent complied with the program's conditions for a short period of time, but by the end of 2007, she was no longer in compliance, having failed to pay her rent or utilities. In the spring of 2008, she was discharged from the program for noncompliance. From May to July, 2008, the respondent did not have stable housing, intermittently staying in a hotel and with various family members and friends. It was this homelessness and transience that led to Kamari's

[7] The court noted that the purpose of the supportive housing program is "the preservation and reunification of families," and that the program assists families with organizing their finances, helping them pay their rent, utilities and food bills, and assisting them with treatment providers.

removal. In August, 2008, however, after Kamari had been removed from her care and one month before Kamarion was born, the respondent obtained a three bedroom apartment in Ansonia. As of the last day of trial, March 6, 2009, the respondent was still residing in the apartment with Kamarion, who had been living there with her since October, 2008.

A second issue of concern to the court was the respondent's substance abuse. In July, 2008, at about the date that Kamari was removed from her care, the respondent was referred for a substance abuse evaluation, urine screen and hair toxicology screen. She did not attend the evaluation or the screenings, nor did she attend five subsequent substance abuse screenings, and she refused to submit to a hair toxicology screen. On September 25, 2008, the respondent finally agreed to submit to a hair toxicology screen and substance abuse evaluation. At that time, she admitted to using marijuana as recently as April, 2008. A urinalysis screening taken on September 25, 2008, however, tested positive for the use of marijuana. Additionally, the hair toxicology screen taken in October, 2008, revealed her use of cocaine. It also showed that the respondent had used marijuana for at least the ninety days prior to the sample collection on January 27, 2009, as evidenced by positive results for hair segments covering zero to thirty days, thirty to sixty days and sixty to ninety days prior to the date of the sample collection. Based on these results, the substance abuse testing center recommended that the respondent participate in outpatient relapse prevention services, as well as individual and group therapy. The department attempted to arrange these services for the respondent, but she repeatedly failed to show up for scheduled intake assessments. At the time of the neglect hearing, the court determined that the respondent was in denial about her drug use, "as demonstrated by her testimony that the last time she [used] drugs

was in June or July, [2008]." As of the date of trial, the respondent still was not engaged in substance abuse treatment.

The court also noted that the respondent has a history of mental health issues dating back to 2005, when the department first became involved in her life. Since 2006, the respondent has received numerous services to address her mental health issues. In 2006 and 2007, she was evaluated by Michael Haymes, a court-appointed forensic psychologist. Haymes diagnosed her with mood disorder, attention deficit hyperactivity disorder and borderline personality disorder. Haymes recommended that the respondent get "back to basic" schooling to address her reading deficiencies, that she participate in group therapy, individual therapy and marriage counseling, and that she receive a full psychiatric evaluation to consider the possible use of psychotropic medications. Thereafter, the respondent was referred to social worker April Reiss for counseling in September, 2007. Reiss testified that the respondent initially came with the children's father to address their marital problems and that after the father stopped participating in counseling, the respondent continued individually for other mental health issues until August, 2008. Reiss diagnosed the respondent with chronic depression and oppositional disorder. Reiss characterized their counseling sessions as "very erratic, continuously erratic," and stated that they occurred more often, then less often, sometimes in person and sometimes over the telephone.

Although Reiss stated that she thought the respondent had made progress, she acknowledged that if the respondent were continuing to engage in substance abuse, "that would not be progress." The court noted that it was unclear from Reiss' testimony exactly what mental health goals were being pursued and whether any progress had been made toward that end. The court

expressed doubt in that regard, considering evidence of the respondent's ongoing substance abuse and her failure to engage on a consistent basis in mental health treatment. In October, 2008, the respondent was again referred for mental health treatment but refused to accept additional services. The department attempted to arrange services at a hospital closer to the respondent's home, but she repeatedly failed to attend scheduled intake appointments. As of the date of trial, the respondent was not engaged in any mental health treatment services.

On the basis of the foregoing facts, the court found that the respondent had failed to show that she could consistently follow through with the services that she had been offered to address her substance abuse and mental health issues and that her failure to do so created a risk of harm to her children. The court determined that as of the adjudicatory date of May 7, 2008, Kamari was neglected in that he was being denied proper care and attention and was permitted to live under conditions that were injurious to his well-being. The court also found, as to Kamarion, that the petitioner had established the elements of neglect by a fair preponderance of the evidence based on the doctrine of predictive neglect.[8] The court adjudicated the children neglected and, as to disposition, determined that it was in their best interests to be committed to the care and custody of the petitioner. This appeal followed.

Initially, we address the petitioner's claim that the respondent's appeal should be dismissed as moot. "Mootness implicates [the] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence

---

[8] Although the court made note in its memorandum of decision that both children were neglected on the basis of the doctrine of predictive neglect, it is clear from the court's analysis that it addressed the neglect claim, as to Kamari, as entailing actual neglect.

of an actual controversy is an essential requisite to appellate jurisdiction . . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . Because mootness implicates subject matter jurisdiction, it presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *Conservation Commission* v. *DiMaria*, 119 Conn. App. 763, 768, 989 A.2d 131 (2010).

During the pendency of this appeal, the respondent filed a motion to revoke the commitment of Kamari and Kamarion, pursuant to General Statutes § 46b-129 (m), on the ground that cause for commitment no longer existed and that it would be in the best interests of the children to be returned to the respondent's custody.[9] The court, *Epstein, J.*, denied the motion, and the respondent did not appeal. The petitioner claims, therefore, that even if we were to reverse the decision of the court, *Wilson, J.*, on appeal, the subsequent decision by the court, *Epstein, J.*, would still stand and would prevent this court from granting any practical relief. We disagree. In denying the respondent's motion to revoke commitment, Judge Epstein did not confirm Judge Wilson's previous finding of neglect or recommit the children to the petitioner. Rather, Judge Epstein simply held that the respondent had failed to demonstrate that cause for commitment no longer existed. If this court were to find in favor of the respondent,

[9] General Statutes § 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months."

regarding either the adjudication of neglect or the commitment order, our determination would render the subsequent decision by the court, *Epstein, J.*, a nullity, as the commitment would no longer be in effect. We conclude, therefore, that the respondent's appeal is not moot.

Having established jurisdiction to address the respondent's appeal, we now address the respondent's claim that the court improperly adjudicated Kamari and Kamarion neglected. Specifically, the respondent claims that the petitioner did not present sufficient evidence to establish, under § 46b-120 (9), that Kamari was neglected and that the court improperly applied the doctrine of predictive neglect to find that Kamarion was neglected. We disagree.

Initially, we set forth our standard of review. "When considering a challenge to the sufficiency of the evidence, the function of an appellate court is to review the findings of the trial court, not to retry the case. . . . [W]e must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Citation omitted; internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 829, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

"Neglect proceedings, under . . . § 46b-129, are comprised of two parts, adjudication and disposition." *In re Brianna C.*, 98 Conn. App. 797, 801, 912 A.2d 505 (2006). During the adjudicatory phase, the court

determines if the child was neglected. Practice Book § 35a-7 (a) provides in relevant part: "In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment . . . ." Section 46b-120 (9) provides that a child may be found neglected if the child is "being denied proper care and attention, physically, educationally, emotionally or morally," or is "being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . ."[10] "The [petitioner], pursuant to [§ 46b-120], need not wait until a child is actually harmed before intervening to protect that child. . . . This statute clearly contemplates a situation where harm could occur but has not actually occurred. Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare *may* be adversely affected and not just children whose welfare has been affected." (Emphasis added; internal quotation marks omitted.) *In re Jermaine S.*, supra, 86 Conn. App. 831. "The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred." *In re T.K.*, 105 Conn. App. 502, 513, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008). Thus, "[a] finding of neglect is not necessarily predicated on actual harm, but can exist when there is a potential risk of neglect. . . . The standard of proof applicable to non-permanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence." (Citation omitted.) *In re Brianna C.*, supra, 802.

---

[10] General Statutes § 46b-120 (9) provides in relevant part: "[A] child or youth may be found 'neglected' who (A) has been abandoned, or (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused . . . ."

In addressing the respondent's claim, we must first determine whether the facts set forth in the court's memorandum of decision are supported by the evidence. Although the respondent makes the sweeping assertion that the court's factual findings were clearly erroneous, she does not identify a single factual conclusion in the court's memorandum of decision as being erroneous.[11] Rather, by making a wholesale assault on the court's decision, the respondent appears to be asking this court to reweigh the evidence that was presented to the trial court.[12] This we will not do, as it is not the function of a court of review to retry the facts. See *Lederle* v. *Spivey*, 113 Conn. App. 177, 190, 965 A.2d 621, cert. denied, 291 Conn. 916, 970 A.2d 728 (2009). On the basis of our independent review of the record, we conclude that the court's factual findings were not clearly erroneous.

We next assess whether the facts properly found by the court were sufficient to support its neglect determination. The respondent's insufficiency claim is premised, in part, on her assertion that the court should not have considered this to be a case of predictive neglect as to Kamarion. The respondent notes that because

[11] As an aside to the respondent's claim, she asserts that the court improperly admitted the testimony of Haymes, testimony she claims was irrelevant and hearsay that was not within a recognized exception to the rule against hearsay. This claim is briefed inadequately and we do not address it. "We are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." (Internal quotation marks omitted.) *Hasychak* v. *Zoning Board of Appeals*, 296 Conn. 434, 437 n.4, 994 A.2d 1270 (2010).

[12] The respondent appears to claim that the court should have given greater weight to the testimony of Reiss and less weight to that of Haymes and Kelly Thibault, a department social worker. Weighing of evidence is, of course, the function of the trier of facts and not that of a court of review.

Kamarion was only three days old and still in the hospital when the petitioner filed the neglect petition in September, 2008, the child was never in the respondent's custody. Therefore, the respondent points out, the only basis on which the petitioner could allege neglect was predictive. She argues, however, that because she resumed custody of Kamarion from October, 2008, until July, 2009, after the petition had been filed, and that during that time there was no evidence of neglect, it was inappropriate for the court to apply the doctrine of predictive neglect. Essentially, she claims that it is inconsistent to find neglect based on a *prediction*, when there was actual evidence showing a lack of neglect while Kamarion was in her care subsequent to the filing of the petition.[13] The respondent's argument ignores Practice Book § 35a-7 (a). As noted previously, during the adjudicatory phase, "the judicial authority is limited to evidence of events preceding the filing of the petition . . . ." Practice Book § 35a-7 (a). Accordingly, the court properly determined that any evidence of sound parenting, or lack thereof, that occurred after the filing of the neglect petition relating to Kamarion, was not relevant to the adjudication stage of the neglect proceeding.

Upon a careful review of the court's memorandum of decision, we find substantial evidence to support the court's finding of neglect as to both children and its commitment of the children to the petitioner. As of May 7, 2008, the date that the petitioner filed its neglect petition as to Kamari, the respondent had had an extensive history with the petitioner arising from her inability to care for her eldest child, Keyashia. The similarity between the respondent's parenting issues in 2005 and those present in 2008 evinced a lack of rehabilitation

---

[13] The respondent states in her brief that she does not concede that there was sufficient evidence presented to justify the neglect adjudication as to Kamari; however, that assertion begins and ends any discussion of the evidence relating to Kamari.

as to her mental health issues and a persistent lack of stable housing. The court heard evidence, which it was entitled to credit, that the respondent had failed to accept consistently state services to address those issues. In May, 2008, the respondent did not have housing, having failed to pay her rent or utilities at what was then her most recent apartment. She was dismissed from the special housing program, which was the only reason she had an apartment to begin with, due to her failure to comply with the program's conditions. There was evidence that the respondent had mental health issues, which she had not dealt with effectively. From March to May, 2008, the respondent had ceased attending individual counseling sessions with Reiss, and there was no evidence that the respondent had attempted to engage in any of the numerous other treatments that were recommended by Haymes. Haymes testified about the respondent's emotional instability, inability to maintain a healthy relationship and the significant risk she posed to her children. On the basis of the foregoing facts, we conclude that there was sufficient evidence for the court to have found by a preponderance of the evidence that Kamari had been, and was at risk of being, denied proper care and attention and was permitted to live under conditions that were injurious to his well-being.

Regarding Kamarion, in September, 2008, when the petitioner filed the neglect petition pertaining to him, there existed the same evidence regarding the respondent that had been available in May, 2008, regarding the respondent's inability to care for Keyashia properly. This need not be repeated in detail, but, as noted previously, it entailed a long history of mental health issues that had not been consistently or sufficiently addressed by the respondent and a lack of stable housing. In August, 2008, the respondent stopped going to Reiss for counseling and did not engage in any other mental

health treatment. From May to July, 2008, the respondent was homeless, at times staying in a hotel or with various friends and family members. Additionally, by September, 2008, there was evidence that the respondent was engaged in substance abuse. She admitted to having smoked marijuana while she was pregnant with Kamarion, as well as having used ecstasy on one occasion. Accordingly, we conclude that there was sufficient evidence for the court to have found that the respondent's pattern of behavior and inability to achieve personal rehabilitation created a potential risk of harm to Kamarion, and that the court properly determined that Kamarion was neglected based on the doctrine of predictive neglect.

Moving from the adjudication of neglect to the court's disposition, the respondent and the children next claim that the court improperly committed Kamari and Kamarion to the care and custody of the petitioner. Specifically, they claim that there was insufficient evidence presented to support the court's conclusion that it was in the best interests of the children that they be committed to the custody of the petitioner.[14] We disagree.

[14] The children also argue that the court failed to apply the appropriate legal standard for determining what was in their best interests. Specifically, counsel for the children, relying on *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 455 A.2d 1313 (1983), argues that the court failed to apply the proper balancing test, which involves weighing the children's safety interest against the "parent's and child's combined fundamental right to family integrity." We agree with the petitioner that *In re Juvenile Appeal (83-CD)* is not controlling in this case. That case pertained to an emergency removal, but the case at hand concerns the determination of the proper placement of children after they already have been deemed neglected. Further, the court clearly indicated that it followed the dictate of § 46b-129 (j) by evaluating "which of the various custody alternatives [was] in the best interest of the child[ren]." *In re Brianna C.*, supra, 98 Conn. App. 804. Additionally, the court's analysis necessarily involved a weighing of interests, as evidenced by its clearly articulated consideration of whether it was in the "child[ren]'s best interest to be committed to the commissioner rather than to remain with the respondent." Id. Thus, we find no merit to the children's claim that the court failed to apply the appropriate legal standard in making its dispositional decision.

The second phase of a neglect proceeding is the dispositional phase. Section 46b-129 (j) provides in relevant part that "[u]pon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit such child or youth to the Commissioner of Children and Families. . . ." "In determining the disposition portion of the neglect proceeding, the court must decide which of the various custody alternatives are in the best interest of the child. To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [the child's] environment." (Internal quotation marks omitted.) *In re Brianna C.,* supra, 98 Conn. App. 804.

"We have stated that when making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *In re Karl J.,* 110 Conn. App. 22, 26, 954 A.2d 231, cert. denied, 289 Conn. 954, 961 A.2d 420 (2008). "At trial, the commissioner had the burden of proving by a fair preponderance of the evidence that it was in the child's best interest to be committed to the commissioner rather than to remain with the respondent." *In re Brianna C.,* supra, 98 Conn. App. 804. On appeal, we must

determine whether there was sufficient evidence before the court so that it reasonably could have found, by a fair preponderance of the evidence, that the best interests of the children were to commit them to the custody of the petitioner. See id.

Upon a careful review of the record, we find sufficient evidence for the court to have concluded that it was in the best interests of Kamari and Kamarion that they be placed in the custody of the petitioner. As noted, the respondent has a history of mental health issues and substance abuse. It serves no useful purpose to repeat the court's specific findings as to these issues except to note that as of the time of trial, the court had observed that the respondent's mental health and substance abuse issues still were not being addressed, a significant finding implicating the best interests of the children.

As to the respondent's claim that she had stabilized her housing in August, 2008, and continued to reside in that apartment at the time of the neglect hearing, the court fairly noted that this positive step was insufficient to eclipse its concerns for the well-being of Kamari and Kamarion, and the respondent's ability to care for these children based on her persistent failure to engage in treatment for her substance abuse and mental health issues. In sum, we conclude that the court reasonably could have found, on the basis of a fair preponderance of the evidence, that it was in the best interests of Kamari and Kamarion that they be committed to the care and custody of the petitioner.

The judgments are affirmed.

In this opinion the other judges concurred.