IN RE JA-LYN R.*
(AC 33423)

DiPentima, C. J., and Bear and Schaller, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 12—officially released November 29, 2011

*John M. Eichholz*, for the appellant (respondent mother).

*Stephen G. Vitelli*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Michael J. Culkin*, for the minor child.

*Opinion*

DiPENTIMA, C. J. The respondent mother appeals from the judgment of the trial court committing her minor child Ja-lyn R. to the custody of the petitioner, the commissioner of the department of children and families (commissioner).[1] On appeal, the respondent claims that the court (1) had insufficient evidence to support a determination of neglect and (2) improperly concluded that it was in the best interest of Ja-lyn to commit him to the custody of the commissioner.[2] We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. On January 22, 2010, Ja-lyn was born and then placed directly into the custody of the department of children and families (department) under a ninety-six hour administrative hold pursuant to General Statutes § 17a-101g (e) and (f). On January 28, 2010, the commissioner filed a neglect petition on behalf of Ja-lyn and obtained an order of temporary custody from

[1] The court's adjudicatory and dispositional order also named the respondent father, but he has not filed an appeal of the court's judgment. We therefore refer in this opinion to the respondent mother as the respondent. Additionally, we note that pursuant to Practice Book § 67-13 (2), counsel for Ja-lyn filed a statement adopting the brief of the commissioner in this appeal.

[2] Although the respondent conflates these two claims in her brief, we note that the court's determination of neglect and the court's commitment of Ja-lyn to the custody of the commissioner are distinct legal conclusions with differing standards of review on appeal. See *In re Kamari C-L.*, 122 Conn. App. 815, 824–25, 829–30, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010). We therefore will review these claims separately.

the court that same day. The petition alleged that Ja-lyn was being denied proper care and attention physically, educationally, emotionally or morally and that he was being permitted to live under conditions, circumstances or associations injurious to his well-being.[3] In an addendum to the petition, the commissioner alleged that the respondent had cognitive limitations and ongoing unresolved mental health and substance abuse issues. The commissioner also alleged that the respondent exhibited poor parenting and serious anger management issues. Finally, the commissioner alleged that the respondent had a criminal charge of risk of injury to a child pending in regard to her older child, a daughter, and that there were issues of domestic violence between the respondent and the father of Ja-lyn.

On February 23, 2010, the respondent agreed to the order of temporary custody. On March 4, 2011, the court denied the respondent's motion to vacate the order. On March 4, 2011, after a trial, the court determined that Ja-lyn was a neglected child and committed him to the custody of the commissioner. The court found that the respondent had been working with the department since the birth of her older child. The court found that the respondent's history confirmed that "even after taking advantage of offered services [the respondent] has been unable to safely care for [her children]. [The respondent's] history is that she manages to successfully complete the work required for reunification, but fails to apply what she has learned when given the opportunity." The court concluded that the respondent

---

[3] We note that the commissioner's social study in support of its neglect petition alleged the following: "On [January 22, 2010], [the respondent] gave birth to her second child, Ja-lyn . . . . At the time of [the respondent's] admission to the hospital, [the respondent] tested positive for marijuana. A referral was made to the [department] by Waterbury Hospital due to [the respondent's] substance abuse problem and her erratic behavior towards the hospital staff. The staff was afraid to leave the child unsupervised around [the respondent]."

"must make a commitment to cooperate with [the department] and any offered services to earn reunification with her children." Accordingly, the court adjudicated Ja-lyn neglected and committed him to the custody of the commissioner. This appeal followed.

Before addressing the respondent's claims, we first set forth the procedures governing neglect proceedings. "Neglect proceedings, under . . . [General Statutes] § 46b-129, are comprised of two parts, adjudication and disposition. . . . During the adjudicatory phase, the court determines if the child was neglected. Practice Book § 35a-7 (a) provides in relevant part: In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment. . . . [General Statutes § 46b-120 (9)] provides that a child may be found neglected if the child is being denied proper care and attention, physically, educationally, emotionally or morally, or is being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . . The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) *In re Kamari C-L.*, 122 Conn. App. 815, 824–25, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010).

I

The respondent first claims that there was insufficient evidence to support the court's determination of neglect. We disagree.

We begin our analysis by setting forth the applicable standard of review. "When considering a challenge to the sufficiency of the evidence, the function of an appellate court is to review the findings of the trial court, not to retry the case. . . . [W]e must determine

whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Internal quotation marks omitted.) Id., 824.

"Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected. . . . General Statutes § 17a-101 (a) provides: The public policy of this state is: To protect children whose health and welfare *may* be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of *suspected* child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re T.K.*, 105 Conn. App. 502, 511–12, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008). The doctrine of predictive neglect provides that "[t]he department, pursuant to [§ 46b-120], need not wait until a child is actually harmed before intervening to protect that child. . . . This statute clearly contemplates a situation where harm could occur but has not actually occurred."[4] (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App.

[4] The respondent argues that there was insufficient evidence before the court to show that Ja-lyn himself actually was neglected. Because our conclu-

819, 831, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

Here, the department took custody of Ja-lyn before he left the hospital. The commissioner filed a neglect petition on behalf of Ja-lyn and obtained an order of temporary custody just six days after his birth. The court concluded, however, that an adjudication of neglect was warranted on the basis of, among other things, the respondent's prior history with the department and her unresolved anger management issues. See, e.g., *In re Kamari C-L.*, supra, 122 Conn. App. 826–27 (applying predictive neglect where child was three days old at time of neglect petition, where respondent had long history with department relating to care of her eldest child). The court referenced the testimony of Mary Howard, a social worker for the department, who stated the following at trial: "At the time of Ja-lyn's birth, the department invoked a ninety-six hour hold, based on that [the respondent] had a long [department] history. There—also, that [the respondent] had unaddressed substance abuse problems and mental health issues. [The respondent] had a child in [the department's] care, her oldest child . . . . That [the respondent] tested positive for marijuana, at the time of Ja-lyn's birth. [The respondent] also had anger management and poor parenting issues. And the father of Ja-lyn was incarcerated at the time of his birth. And there was a domestic—there's domestic violence history, between [the respondent] and the father . . . ."[5]

The court expressed concern that the respondent's anger management issues posed a risk to the welfare of

sion that the doctrine of predictive neglect applies is dispositive, we need not address this argument.

[5] With regard to the respondent's alleged substance abuse issues, the court cited the testimony of Joyce James, a clinician from the Morris Foundation, who reported that the respondent was discharged from a program aimed at treating persons exposed to drug environments after she had failed to attend meetings.

Ja-lyn, stating: "[The respondent] has neither completed her specific steps [nor] learned to contain her characteristic outbursts at this time."[6] The specific steps, drafted by the commissioner and approved by the court on the day it approved the order of temporary custody, ordered that the respondent "take responsibility for anger and controlling behaviors and the impact it has on [her] children." The court cited the social study filed by the commissioner in support of the neglect petition, which alleged that the respondent "has a violent temper and needs to find more appropriate skills to express her anger and frustration." See, e.g., *In re Brianna C.*, 98 Conn. App. 797, 802, 912 A.2d 505 (2006) (predictive neglect doctrine applied where father suffered from mental health issues and respondent mother was unable to protect child from him). As noted previously, this allegation was supported by testimony at trial.

The court noted the respondent's prior arrests for assault in the third degree and for assault in the third degree and risk of injury.[7] The latter arrest arose from an incident that occurred on September 3, 2009, when her older child was brought to the emergency room. The court referenced the testimony of emergency room

[6] The court also found that the respondent was unable to control her anger during supervised visits with her children. We note, however, that "any evidence of sound parenting, or lack thereof, that occurred *after* the filing of the neglect petition relating to [the minor child], [is] not relevant to the adjudication stage of the neglect proceeding." (Emphasis added.) *In re Kamari C-L.*, supra, 122 Conn. App. 827; see also Practice Book § 35a-7 (a). This evidence is relevant to the disposition stage of the proceeding, however; accordingly, we consider the evidence in part II of this opinion.

[7] The court incorrectly stated that the respondent was arrested for these charges on June 26, 2009, and November 4, 2009. In fact, the respondent was arrested on June 26, 2009, and September 4, 2009. In addition, the court's memorandum of decision refers to Ja-lyn as female, but in fact, he is male. Finally, the court incorrectly spells the name of the respondent's daughter. These factual inaccuracies, however, do not undermine the court's reasoning. See, e.g., *Roberson* v. *Aubin*, 120 Conn. App. 72, 75, 990 A.2d 1239 (2010). We therefore will not disturb the decision of the court on the basis of these inaccuracies.

physician Jennifer Gannon, who stated that the child presented with a bruise on her left thigh, as well as other minor injuries, and opined that "the cause of the [bruise on her left thigh] was a slap inflicted by an adult." Gannon, however, did not testify that the respondent caused these injuries; rather, she stated: "I don't have any idea who slapped her."

The court also noted the criminal record of Ja-lyn's father and the history of domestic violence between him and the respondent. See *In re T.K.*, supra, 105 Conn. App. 512 (applying doctrine of predictive neglect where marital relationship of respondent parents was strained, resulting in verbal and physical conflict, and both suffered from mental health issues); see also *In re Francisco R.*, 111 Conn. App. 529, 537–38, 959 A.2d 1079 (2008) (applying doctrine of predictive neglect where respondent father was charged with multiple counts of sexual assault against his daughters and had history of domestic violence with mother). The court stated that Sergeant Michael Dethlefsen appeared at trial "to authenticate sixteen documents for the purpose of admission as exhibits offered by [the department] as to criminal activity and domestic violence in the family." The record discloses, for example, an incident that occurred on December 3, 2009, between Ja-lyn's father and the respondent, who was seven months pregnant at the time. According to the police report, the respondent stated that Ja-lyn's father "came home drunk and began an argument with her while they were in the bedroom. . . . [He] then grabbed her by the hair with both hands and slammed her onto her bed. [He] then began to strangle [her] by placing both hands around her throat and squeezing tightly [where] she could not breath[e] and to the point where she almost passed out of consciousness." On January 15, 2010, one week before the birth of Ja-lyn, a protective order was issued against Ja-lyn's father in favor of the respondent.

We conclude, on the basis of the record in this case, that there was sufficient evidence, as a matter of law, from which the court reasonably could have determined Ja-lyn to be a neglected child.

## II

The respondent also claims that the court improperly concluded that it was in the best interest of Ja-lyn to commit him to the care of the commissioner. We disagree.

We first set forth the applicable standard of review. "[W]hen making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *In re Haley B.*, 81 Conn. App. 62, 67, 838 A.2d 1006 (2004).

After an adjudication of neglect is made, "a court may (1) commit the child to the commissioner, (2) vest guardianship in a third party or (3) permit the parent to retain custody with or without protective supervision. General Statutes § 46b-129 (j)." *In re Brianna C.*, supra, 98 Conn. App. 804. In determining the disposition portion of the neglect proceeding, the court must decide which of the various custody alternatives are in the best interest of the child. "To determine whether a custodial placement is in the best interest of the child,

the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [the child's] environment." (Internal quotation marks omitted.) Id.

The court, in committing Ja-lyn to the custody of the commissioner, also ordered the department to construct a visitation program for the respondent providing for supervised visits with Ja-lyn and his sister. The court ordered the department to "continue to provide treatment and training services designed to control [the respondent's] explosive behavior and improve her child care skills," and ordered the respondent to "seek and successfully complete another program of cognitive behavioral therapy designed to support her efforts to control her anger and support her children." The court's commitment of Ja-lyn to the custody of the commissioner "is not one of permanency, such as a judgment of termination of parental rights, but one that requires, pursuant to § 46b-129 (j), the court to order specific steps which the parent must take to facilitate the return of the child or youth to the custody of such parent." (Internal quotation marks omitted.) *In re Brianna C.*, supra, 98 Conn. App. 805.

Here, the court committed Ja-lyn to the custody of the commissioner after finding that the respondent was unable to care for him safely on the basis of the respondent's prior history with the department, her anger management issues and her inability to work with the department to improve her parenting skills. The court noted, but did not explicitly credit, the testimony of Howard, who expressed "concerns about sexual/physical abuse, domestic violence, [and] criminal activity . . . ."[8] The court also referenced the testimony of Eliz-

---

[8] The respondent argues that there is no evidence in the record that Ja-lyn was sexually abused. We need not reach this issue, however, because there is ample evidence in the record otherwise supporting the court's decision.

abeth Schiaroli, a social worker for the department, who testified regarding the respondent's anger management issues.[9] The court reasonably found that "[the respondent] is not yet able to control and support both children simultaneously during supervised visitation." At trial, Pam Williams, an employee of Community Residences, Inc., who supervised visits between the respondent and her children, testified that the respondent had difficulty managing both children at once. The court properly found that the respondent "is not inclined to follow through with recommendations offered by [the department] providers to enhance her child caring skills."[10] See, e.g., *In re Stanley D.*, 45 Conn. App. 606, 612–13, 697 A.2d 370 (committing child to custody of commissioner where respondent wilfully failed to cooperate with department), cert. denied, 243 Conn. 910, 701 A.2d 333 (1997).

We conclude that the court did not abuse its discretion in determining that it was in the best interest of Jalyn to commit him to the custody of the commissioner.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] At trial, for example, Schiaroli recalled the following incident: "[The respondent] was complaining rather loudly about Ja-lyn's hair. There was, I believe, food stuck in it. And she was getting quite upset, she was yelling. . . . And both children appeared to be visibly upset. And shortly after [the respondent's daughter] did wet her pants. It caused me concern that [the respondent's] angry outburst affected [her daughter]."

[10] The court noted the testimony of Howard, who testified as follows: "There [were] other concerns that if I tried to direct [the respondent] in any type of parenting that I thought would be a good recommendation or a good suggestion, she would make comments towards me, derogatory comments at me, or she would minimize the situation and would get upset. And any time I would try to instruct her on something that I thought would be helpful for her, as far as parenting goes, she would take that as criticism. And she would just ignore what I had to say."