IN RE ETTA H. ET AL.*
(AC 35531)

DiPentima, C. J., and Alvord and Sullivan, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 11—officially released November 6, 2013**

---

** November 6, 2013, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Alison P. Gaston,* with whom, on the brief, was *Erich H. Gaston,* for the appellant (respondent mother).

*Susan T. Pearlman,* assistant attorney general, with whom, on the brief, were *George Jepsen,* attorney general, and *Benjamin Zivyon* and *Karrol-Ann Brown,* assistant attorneys general, for the appellee (petitioner).

*Ingrid E. Swanson,* for the minor children.

*Opinion*

ALVORD, J. The respondent mother (mother) appeals from the judgments of the trial court terminating her parental rights as to her minor child Etta H. (Etta),[1] adjudicating her minor child Queensara H. (Queensara), neglected, and committing Queensara to the custody of the petitioner, the Commissioner of Children and

---

[1] The court also terminated the parental rights of the respondent father (father), who is married to the mother, in the same proceeding. Only the mother has filed this appeal.

Families (commissioner). On appeal, the mother claims that, with respect to Etta, the court made clearly erroneous factual findings that: (1) the Department of Children and Families (department) made reasonable efforts to reunify the mother and Etta; (2) the mother is unable or unwilling to benefit from reunification efforts; (3) the mother failed to achieve sufficient personal rehabilitation under General Statutes § 17a-112 (j) (3) (B); and (4) termination of the mother's parental rights is in Etta's best interests. With respect to Queensara, the mother argues that: (1) the court made a clearly erroneous factual finding that Queensara is a neglected child; and (2) the court's finding that committing Queensara to the care and custody of the commissioner is in Queensara's best interests was a clear abuse of the court's discretion. We affirm the judgments of the trial court.

The record reveals the following relevant facts and procedural history. Etta was born in December, 2009. A referral to the department followed the mother's arrest in February, 2010, for assault and breach of the peace arising out of an altercation with the father, for which Etta was present. The commissioner filed an order of temporary custody of Etta in May, 2010, on the basis of another domestic violence incident between the mother and the father. Etta was committed to the care and custody of the commissioner in August, 2010. She has been in her current foster placement since November, 2010.[2] On July 27, 2011, the commissioner filed a petition pursuant to General Statutes § 17a-112 to terminate the parental rights of the mother for failure to achieve a sufficient degree of personal rehabilitation as to Etta.

[2] This is Etta's fourth foster placement since coming into the department's care. Etta's current foster parents are willing to adopt her.

Queensara was born in late September, 2011. On October 5, 2011, the commissioner filed a petition pursuant to General Statutes § 46b-129, alleging that Queensara was neglected in that she was permitted to live under conditions, circumstances, or associations injurious to her well-being. The commissioner also filed an order for temporary custody. Queensara was placed in the same foster home as her sister, Etta, in October, 2011.

On January 30, 2012, the court, *Gilligan, J.,* granted the commissioner's motion to consolidate the two petitions for purposes of trial. Following six days of testimony from eleven individuals over the course of eight months, the court, *Brown, J.,* issued a memorandum of decision on February 22, 2013, and rendered judgments terminating the mother's parental rights as to Etta, adjudicating Queensara neglected, and committing Queensara to the custody and care of the commissioner. This appeal followed.

I

We first address the mother's claims regarding the termination of her parental rights as to Etta. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)][3] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts . . . to reunify the child with the parent . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and [the parent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

dispositional phase . . . [in which] the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Jah'za G.*, 141 Conn. App. 15, 30, 60 A.3d 392, cert. denied, 308 Conn. 926, 64 A.3d 392 (2013).

"Our standard of review on appeal from a termination of parental rights is limited to whether the challenged findings are clearly erroneous . . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence . . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Kamal R.*, 142 Conn. App. 66, 69–70, 62 A.3d 1177 (2013).

A

We address the mother's first two claims together. The mother challenges the court's finding that the department made reasonable efforts to reunify the mother and Etta, and emphasizes the lack of "at home" and overnight visits with Etta in support of her argument.[4] She also contends that she consistently has

---

[4] The mother also argues that it was not reasonable for the department to fail to refer Etta's father to domestic counseling when domestic violence was the primary concern in reunifying the mother with Etta. The father, however, is not a party to the current appeal. The mother has not established in her brief how she has standing to bring this claim in her brief. It is well settled that we are not required to review claims that are inadequately briefed. *Nowacki* v. *Nowacki*, 129 Conn. App. 157, 163–64, 20 A.3d 702 (2011) ("assignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court" [internal quotation marks omitted]). Accordingly, we decline to address this claim.

engaged with services and sought appropriate treatment and, therefore, the court erred in finding that she is unable or unwilling to benefit from reunification efforts. We do not find her arguments persuasive.

"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re Jah'za G.*, supra, 141 Conn. App. 30–31. "Accordingly, the department [is] required to prove in the trial court either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts." (Internal quotation marks omitted.) *In re Dominico M.*, 141 Conn. App. 576, 580, 61 A.3d 612, cert. denied, 308 Conn. 933, 64 A.3d 331 (2013).

Our review of the record reveals that there was ample evidence supporting the court's finding that the department made reasonable efforts to reunify the mother with Etta and also that the mother was unable or unwilling to benefit from reunification.[5] The court-ordered specific steps for reunification, signed by the mother on October 19, 2010, required, in relevant part, that she participate in counseling and make progress toward the

---

[5] "Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Internal quotation marks omitted.) *In re Dominico M.*, supra, 141 Conn. App. 580. Here, the trial court found that the department satisfactorily proved both circumstances; therefore we shall consider both in our review.

identified treatment goals of obtaining coping skills to manage anxiety and trauma, refraining from aggressive behaviors, and understanding the impact of domestic violence on the child. The department offered the mother multiple programs to aid in her reunification with Etta and to address her mental health needs, parenting education and visitation issues, and domestic violence issues.[6] Supervised visitation with Etta was also provided. Although the mother highlights the testimony of Dr. Logan Green, a psychologist, that Etta would need to spend a significantly greater amount of time with the mother, including overnight visits, in order for a parent-child relationship to be fully established, the record reveals that Dr. Green qualified this assertion by stating it would be detrimental to Etta's best interests to allow that relationship to develop further. He also testified that placing Etta with the mother prior to the mother's development of minimally adequate parenting skills would be placing Etta at risk. Despite the extensive assistance of the department, the mother and the father continued to engage in incidents of domestic violence.[7] This evidence sufficiently supports both of the court's determinations regarding reunification. We conclude, therefore, that the court did not err in finding

---

[6] These services included: (1) a parenting support and education group through Clifford Beers Clinic; (2) the program First Foot Forward to receive additional parenting counseling during visitations with Etta; (3) counseling at the Coordinating Council for Children in Crisis (4Cs) for domestic violence treatment; (4) services at the Post Traumatic Stress Disorder (PTSD) Center; (5) services with Intensive Family Preservation, to address the domestic violence issues and to provide appropriate services to ensure that personal issues did not impact the ability to parent; (6) two court-ordered psychological evaluations with Dr. Logan Green.

[7] These incidents include an April, 2011 altercation where the father punched the mother in the face during an argument while she was four months pregnant with Queensara, resulting in the father's arrest for assault in the third degree on a pregnant person, and a September, 2011 altercation during a joint, supervised visit with Etta at the department, where a dispute between the mother and the father escalated to the point where security had to be called and the father was instructed to leave the premises.

that the mother was unable or unwilling to benefit from reunification efforts and that the department made reasonable efforts to reunify.

## B

The mother also claims that the court erred when it found that she failed to achieve a sufficient degree of personal rehabilitation within the meaning of § 17a-112 (j) (3) (B). The mother insists that the trial court's conclusion that she failed to achieve rehabilitation is clearly erroneous because she made considerable efforts to comply with the court-ordered specific steps to reunify with Etta: she found employment, acquired stable housing, and greatly improved her relationship with the father. The mother asserts that the trial court "essentially penalized" her for her husband's failure to achieve personal rehabilitation. We are not persuaded.

"Section 17a-112 (c) (3) (B) [now (j) (3) (B)] requires the court to determine whether the degree of personal rehabilitation [achieved by the parent] . . . encourage[s] the belief that within a reasonable time . . . such parent could assume a responsible position in the life of the child . . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. . . . [A] trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous . . . ." (Internal quotation marks omitted.) *In re Christopher C.*, 134 Conn. App. 464, 470, 39 A.3d 1122 (2012).

"Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . [E]ven if a parent has made successful strides in her ability to manage her life and may have achieved a level

of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children." (Citations omitted; internal quotation marks omitted.) *In re Alejandro L.*, 91 Conn. App. 248, 260, 881 A.2d 450 (2005). "[P]sychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.) *In re Luciano B.*, 129 Conn. App. 449, 475, 21 A.3d 858 (2011).

Our review of the record supports the trial court's conclusion that the mother failed to attain a sufficient degree of personal rehabilitation. Although the court acknowledged that the mother was making progress, it found that she had not achieved a degree of personal rehabilitation to convince the court that she is ready to resume a responsible role in Etta's life. The evidence before the court included testimony from Dr. Green that the earliest that the mother would be in a position to care for Etta was December, 2013, and the latest was June, 2014.[8] The court recognized that this time frame, however, presumes that the mother continues to make progress toward her goal of "becoming self-sufficient, consistent with [her] therapy and counseling and avoid[ing] future domestic disputes." The court identified the family's domestic violence history as one of the major factors contributing to Etta's commitment and, while it did refer to evidence that the father failed to complete a domestic violence course as part of its failure to rehabilitate analysis, there was ample evidence in the record regarding the mother's failure to fully rehabilitate from her involvement in the domestic violence. In addition to the domestic violence incidents

---

[8] Dr. Green testified that during this period of time, Etta would be developing an attachment system with whomever she was with, and reunification would "tear her away from that."

in April and September, 2011, the court heard testimony that the mother and the father's personal issues with each other began "leaking into the visit[s]" with Etta, and their yelling and negative demeanor toward each other often caused Etta to cry and become withdrawn. Dr. Green testified that he did not see any significant mental health progress or change in the mother's presentation between her 2010 and 2011 evaluations, and the mother continued to lack the desire to work through the domestic violence issues even as late as her 2011 evaluation. He determined in his 2011 evaluation that the mother has "not developed [a] minimal set of skills that are important in raising a child of Etta's age." We therefore conclude that the court's finding that the mother failed to achieve a sufficient degree of personal rehabilitation was not clearly erroneous.

C

The mother next argues that the court's finding that the termination of the mother's parental rights was in Etta's best interests was clearly erroneous. The mother specifically directs this court's attention to the fourth factor in § 17a-112 (k),[9] and argues that the trial court erred in discounting the bond and love between the mother and Etta.[10] We are not persuaded.

[9] General Statutes § 17a-112 (k) (4) provides in relevant part: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."

[10] The mother also points to the first, second, and sixth factors of § 17a-112 (k), but fails to raise any new arguments regarding the court's attention to these factors. Instead, she merely directs us to review the arguments she made earlier in her brief concerning whether the department made reasonable efforts to reunify the mother and Etta and whether the mother failed to achieve personal rehabilitation under § 17a-112 (j) (3) (B) (i). It is well settled that we are not required to review claims that are inadequately briefed. *Nowacki* v. *Nowacki*, 129 Conn. App. 157, 163–64, 20 A.3d 702 (2011).

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . [T]he trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Alison M.*, 127 Conn. App. 197, 211, 15 A.3d 194 (2011).

On the basis of our review of the record in the present case, the trial court's decision with respect to the best interests of the child was not clearly erroneous. At the time of the decision, Etta already had been in four placements since coming into the commissioner's care. Dr. Green stated in his report that, with respect to the bond between the mother and Etta, "[E]tta appeared to have positive feelings for both her parents and certainly related well to them . . . . There is an ongoing parent/child relationship in the minds of each parent but I do not know if a similar relationship exists in Etta's mind as Etta is too young an age to verbalize adequately the

Furthermore, we already have dispensed of these arguments in parts I A and B of this opinion. Accordingly, we decline to review these claims.

extent to which she possesses those feelings . . . ." Based upon his evaluations, however, Dr. Green concluded that "it is in Etta's best interests that she remain with her current foster parents with permanency in mind." Dr. Green also opined that Etta is at high risk if she were returned to the mother, and provided extensive testimony as to the negative long-term consequences of the mother's current deficits on Etta's mental health and development. "[O]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." (Internal quotation marks omitted.) *In re Jah'za G.*, supra, 141 Conn. App. 35. Accordingly, the possible existence of a bond between the mother and Etta is not enough to render the court's best interests finding clearly erroneous as the evidence set forth previously sufficiently supports the court's conclusion that termination of the mother's parental rights was in Etta's best interests.

## II

We now turn to the mother's claims as to Queensara. Before addressing the mother's claims, we first set forth the procedures governing neglect proceedings. "Neglect proceedings, under . . . § 46b-129, are comprised of two parts, adjudication and disposition. . . . During the adjudicatory phase, the court determines if the child was neglected. Practice Book § 35a-7 (a) provides in relevant part: In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment. . . . [General Statutes § 46b-120 (6)] provides that a child may be found neglected if the child is being denied proper care and attention, physically, educationally, emotionally or morally, or is being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . ."

(Internal quotation marks omitted.) *In re Ja-lyn R.*, 132 Conn. App. 314, 318, 31 A.3d 441 (2011).

## A

The mother contends that there was insufficient evidence from which the trial court could conclude that it is more likely than not that Queensara would be permitted to live under conditions, circumstances or associations injurious to Queensara's well-being. In support, she cites to our Supreme Court's discussion of predictive neglect in *In re Joseph W.*, 305 Conn. 633, 46 A.3d 59 (2012). She also argues that the court failed to make findings whether she was willing to care for Queensara independently of the father. We are not persuaded.

As we previously have established, "[a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review." (Internal quotation marks omitted.) *In re Haley B.*, 81 Conn. App. 62, 65, 838 A.2d 1006 (2004). "[Connecticut] statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected. . . . The doctrine of predictive neglect provides that [t]he department, pursuant to [§ 46b-120], need not wait until a child is actually harmed before intervening to protect that child. . . . This statute clearly contemplates a situation where harm could occur but has not actually occurred." (Citations omitted; internal quotation marks omitted.) *In re Ja-lyn R.*, supra, 132 Conn. App. 319.

Our review of the record and trial transcript reveals that there was testimony and other evidence to support the trial court's finding of neglect. As we have previously noted, the record establishes that there was a significant history of domestic violence between the mother and the father, which included an altercation a

few months prior to Queensara's birth and a heated conflict during a supervised visit with Etta just days before Queensara's birth. Consequently, the mother, the father, and the department entered into a safety plan prior to Queensara's birth with the goal of ensuring that Queensara was not injured during one of these domestic violence incidents or exposed to a violent and hostile environment. The record reveals that both the mother and the father failed to abide by this safety plan—the father refused to continue safety planning and the mother failed to keep Queensara in a safe, conflict free environment as planned. This failure to comply with the safety plan, coupled with the history of domestic violence, sufficiently supports the court's conclusion that Queensara was permitted to live under conditions, circumstances, or associations injurious to her well-being.

In support of her assertion that the court failed to make findings as to whether she was willing to care for Queensara independently of the father, the mother points to *In re Joseph W.*, supra, 305 Conn. 633, specifically: "[I]n neglect proceedings involving the doctrine of predictive neglect, the petitioner is required to meet this standard with respect to *each parent* who has contested the neglect petition and who has expressed a desire, or at least a willingness, to care for the child independently of the other parent." (Emphasis in original.) Id., 646. In that case, however, our Supreme Court went on to hold: "If the parents have indicated that they intend to care for the child jointly . . . or if the trial court discredits a parent's claim that he or she intends to care for the child independently, the trial court may treat the parents as a single unit in determining whether the petitioner has met its burden of proving predictive neglect." Id., 647–48.

In the present case, the mother has not directed this court to any evidence that she expressed a desire, or

at least a willingness, to care for Queensara independently of the father. In fact, our review of the record reveals that the mother and the father were married before Etta's birth, that they were residing together at the time of the neglect proceeding,[11] and that together, they created and were raising a third child. The court also heard testimony that the mother had expressed her intent to continue her relationship with the father and that the mother and the father remain committed to one another and remaining a family. Accordingly, we conclude that there was sufficient evidence for the court to treat the mother and the father as a single unit for the purpose of adjudicating whether Queensara was neglected.

## B

Finally, the mother challenges as a clear abuse of discretion the court's finding that committing Queensara to the care and custody of the department is in Queensara's best interests.[12] We disagree.

We begin with the standard of review. "To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment. . . . [W]hen making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion

[11] The court heard testimony that the mother and the father lived together until approximately February, 2010. From February, 2010, to approximately December, 2011 or January, 2012, the mother and the father lived separately due, in part, to their domestic violence history. From December, 2011, or January, 2012, onwards, the mother and the father have been living together in housing provided by their church.

[12] The mother also argues that the court should have transferred guardianship of Queensara to the paternal grandmother, who was granted intervenor status in April, 2011. This argument is without merit because no motion to revoke or transfer guardianship was ever filed in court. Accordingly, this issue was never before the trial court, and we decline to consider it now.

under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court . . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court reasonably could conclude as it did." (Internal quotation marks omitted.) *In re Karl J.*, 110 Conn. App. 22, 26, 954 A.2d 231, cert. denied, 289 Conn. 954, 961 A.2d 420 (2008).

As our review of the evidence before the trial court reveals, there were ample facts from which the court could conclude that it was in the best interest of Queensara to commit her to the care and custody of the commissioner until further order of the court. The mother and the father had engaged in multiple domestic violence incidents prior to Queensara's birth. The court acknowledged that the mother successfully completed domestic violence counseling at 4Cs; however, it found that she still needed to continue to follow through with her mental health counseling and supervised visits with Queensara in order to demonstrate to the court that it would be in Queensara's best interest to be returned home. The department did attempt a reunification program with Queensara and the mother through the R Kids program, but stopped supervised visits in July, 2012, without recommending reunification. R Kids reported that (1) the parents were unable to understand Queensara's emotional needs; (2) the negative effects of the visits on Queensara need to be addressed; and (3) the mother and the father require intensive therapeutic family services. Dr. Green also testified that the mother had not sufficiently rehabilitated enough to care for herself, let alone a small child. Accordingly, it was not unreasonable for the court to conclude that it was in Queensara's best interest to commit her into the care and custody of the department until further order of the court.

The judgments are affirmed.

In this opinion the other judges concurred.