******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE OLIVIA W.*
## (AC 46196)

Bright, C. J., and Moll and Clark, Js.

*Syllabus*

The respondent parents appealed to this court from the judgment of the trial court adjudicating their minor child, O, to be neglected and committing her to the custody of the petitioner, the Commissioner of Children and Families. The Department of Children and Families received a report alleging emotional abuse and maltreatment of O by the respondent father, which was submitted after O's school had discovered an electronic document written by O indicating that the father had abused her. Approximately two weeks later, in November, 2021, while the first report was being investigated by the department, the department received a second report alleging abuse of O by the father, which indicated that the father had dropped O off at the emergency department of a local children's hospital for concerns of her mental health and behavior. The report further indicated that O had told hospital staff that the physical injuries that she had sustained, from her head down to her left shin, had been inflicted by the father and that there had been physical altercations going on for a while between herself and the father. O was initially released from the children's hospital into the respondent mother's care, but the following day, after a safety assessment, the department determined that O's situation was unsafe and invoked a ninety-six hour hold on O. The petitioner subsequently applied for an ex parte order of temporary custody, which was granted by the court and sustained by the agreement of the parties. The petitioner filed a neglect petition on the grounds that O was being denied proper care and attention, physically, educationally, emotionally, or morally, or permitted to live under conditions, circumstances, or associations injurious to her well-being. In May, 2022, O was admitted to the adolescent unit of another hospital, and she remained in that hospital's care for the duration of the trial on the neglect petition, which spanned from May, 2022, through the middle of December, 2022. Each parent was represented at trial by an attorney until the end of November, 2022, when, on the fourteenth day of trial and during their case-in-chief, the parents filed appearances in lieu of their respective attorneys and proceeded to represent themselves for the remainder of the trial. Several days later, while the neglect trial was ongoing, the petitioner filed an emergency motion for an evidentiary hearing and an order authorizing the department to make medical, psychological, and educational decisions on behalf of O, which the court granted after conducting an evidentiary hearing and hearing argument from the parties. On the parents' appeal to this court, *held*:

1. The respondent parents could not prevail on their claim that there was insufficient evidence to support the trial court's determination that O was neglected: after a careful review of the record, this court concluded that the trial court's factual findings with regard to its neglect determination were supported by sufficient evidence in the record, including, but not limited to, medical records, the testimony of the investigative social worker and his investigation protocol, and the photographs depicting O's injuries; moreover, this court further concluded, as a matter of law, that the facts properly found by the trial court, which demonstrated that the respondent father had physical altercations with O and verbally demeaned her prior to November, 2021, that, in November, 2021, after, in his own words, having "lost his shit," the father inflicted excessive physical injuries on O, and that the respondent mother did not intervene to protect O, were sufficient to support the court's neglect determination.

2. The trial court did not abuse its discretion in determining that it was in O's best interest to be committed to the custody of the petitioner: in support of its determination, the court found that O suffered from severe mental health and behavioral problems that required long-term intensive care and therapy, the respondent parents engaged in conduct that was detrimental to O's well-being following her May, 2022 hospitalization, particularly by rescinding medical releases, which prevented the depart-

ment from communicating with O's treatment providers and extended O's hospitalization when other treatment was more appropriate, and, notwithstanding the respondent father's completion of parenting classes and his participation in therapy, the parents' relationship with O was fractured, as evidenced by the father's physical actions toward O committed with the respondent mother's approval, the father's decision to leave O alone at the children's hospital in November, 2021, and the father demeaning O verbally during her later hospitalization; moreover, the court also expressed concern that, with the mother's acquiescence, the father again would react in a physical manner toward O if a situation similar to the incident in November, 2021, occurred in the future; furthermore, the court's findings were supported by sufficient evidence in the record, including, but not limited to, the testimony of medical personnel, department personnel, and the guardian ad litem.

3. The respondent parents could not prevail on their claim that they were denied equitable treatment stemming from numerous procedural or evidentiary errors that purportedly occurred during the neglect proceedings:

a. The parents failed to adequately brief their claims that the trial court improperly precluded them from submitting certain evidence into the record, that the court impermissibly curtailed their right to recall witnesses during their case-in-chief, that the court improperly failed to invalidate a hospital record admitted into evidence that the petitioner had allegedly inappropriately obtained, and that the court impermissibly declined an oral request by the respondent father to permit his former attorney to remain available to him as advisory counsel, and, therefore, this court considered those claims to be abandoned.

b. The parents' claim that the court improperly made comments that prompted the petitioner to file the emergency motion was not supported by the record.

c. Contrary to the parents' claims, the trial court did not abuse its discretion when it precluded the parents, on the last day of their case-in-chief, from seeking to subpoena two children's hospital employees as witnesses, when it declined the father's offer on the last day of trial to introduce into evidence an audio recording of an incident that occurred outside of the courtroom on the fourteenth day of trial, which ultimately resulted in the remainder of the trial being held remotely, when it permitted the petitioner to call certain witnesses during the evidentiary hearing on the emergency motion notwithstanding that the petitioner had failed to disclose them in advance of the hearing, or when it permitted the petitioner to offer certain evidence into the record that the respondent mother did not receive in advance of the evidentiary hearing, given that the petitioner's counsel represented that the document had been emailed to the mother, it was discovered that the petitioner's counsel had emailed the document to an outdated email address of the mother, and the petitioner's counsel represented that she would email the document to the mother's current email address immediately.

d. The trial court properly exercised its discretion to deny the parents' motion for a continuance to allow them to retain new counsel that they filed in December, 2022, on the eighteenth day of trial, on the basis of its reasoning that O's needs required the neglect proceedings to be completed promptly, trial had been ongoing since May, 2022, and it had canvassed the parents when they elected to represent themselves and cautioned them about the perils of self-representation.

e. The parents' claim that they were not given equitable access to department records despite having submitted certain records requests to the department was untenable because the court, in fact, ordered the petitioner to provide the records to the parents, and at no point during the remainder of the trial did the parents indicate to the court that the petitioner had failed to comply with the court's order.

f. The parents failed to demonstrate any impropriety committed by the judge who presided over the pretrial in the underlying action, as their assertion that the pretrial judge engaged in ex parte communications with the petitioner and with a department social worker was belied by the transcript of the hearing, which indicated that the proceeding concerned neglect petitions filed as to the parents' other two children, and any claimed error was outside of the scope of the present matter; moreover, although the pretrial judge granted preliminary relief prior to the evidentiary hearing on the emergency motion, the trial court judge who presided over the neglect trial conducted the evidentiary hearing

and ultimately granted the emergency motion.

Argued October 12, 2023—officially released January 4, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Hon. Stephen F. Frazzini*, judge trial referee; judgment adjudicating the minor child neglected and committing the minor child to the custody of the Commissioner of Children and Families, from which the respondent father appealed to this court; thereafter, the respondent mother was granted permission to join the respondent father's appeal. *Affirmed.*

*Kristen W.*, self-represented, the appellant (respondent father).

*Katrina W.*, self-represented, the appellant (respondent mother).

*Nisa Khan*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark* and *Albert J. Oneto IV*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

PER CURIAM. The self-represented respondents, Kristen W. (father) and Katrina W. (mother), appeal[1] from the judgment of the trial court adjudicating their minor child, Olivia W., to be neglected and committing her to the custody of the petitioner, the Commissioner of Children and Families. On appeal, the respondents raise numerous claims, which we interpret as asserting that (1) there was insufficient evidence to support the court's neglect determination, (2) the court improperly determined that committing Olivia to the custody of the petitioner was in her best interest, and (3) they "were denied equitable treatment" as a result of various procedural or evidentiary errors that purportedly occurred during the neglect proceedings.[2] We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. On November 5, 2021, the Department of Children and Families (department) invoked a ninety-six hour hold on Olivia, who was fourteen years old at the time. On November 9, 2021, the petitioner applied for an ex parte order of temporary custody. On the same day, the trial court, *Hon. Stephen F. Frazzini*, judge trial referee, issued an order of temporary custody, which the court, *Dannehy, J.*, sustained by the agreement of the parties on November 19, 2021.

Additionally, on November 9, 2021, the petitioner filed a neglect petition on the grounds that Olivia was being (1) denied proper care and attention, physically, educationally, emotionally, or morally, or (2) permitted to live under conditions, circumstances, or associations injurious to her well-being. Along with the neglect petition, the petitioner filed a summary of facts substantiating the allegations of neglect, which set forth the following relevant allegations. On October 14, 2021, the department received a report alleging "[e]motional [a]buse/[m]altreatment" of Olivia by the father, which was submitted after Olivia's school had discovered an electronic document written by Olivia indicating that the father had abused her. Specifically, Olivia wrote that (1) " '[the father's] ways of punishment never work when it causes pain,' " (2) the father called her names "such as 'retarded' and 'a disgrace,' " and (3) the father got " 'physical' " with her at times by "throwing objects." When approached by school staff about the electronic document, Olivia began crying and making suicidal statements, which resulted in Emergency Mobile Psychiatric Services responding and evaluating her.

On October 21, 2021, the department conducted a response visit, during which the father conveyed that he did not believe that Olivia was suicidal but, rather, that her "issues stem[med] from [her] being 'unmoti-

vated and lazy.' " During the same visit, Olivia appeared "fearful" of the father as evidenced by "heavy breathing, nervousness and motioning to the responding social worker not to share the things in the [October 14, 2021] report with [the] [f]ather."

On November 2, 2021, the department received a second report alleging abuse of Olivia by the father. Per the report, on the morning of November 2, 2021, the father brought Olivia to the emergency department of the Connecticut Children's Medical Center (CCMC) "for concerns of her mental health and behavior," where he expressed that he " 'just want[ed] the [s]tate to take [Olivia]' and to 'put her in foster care.' " An evaluation at the emergency department revealed that Olivia had sustained "physical injuries on her body from her head down to her left shin  .  .  .  ."[3] Olivia stated that the father had caused her injuries and that "there ha[d] been physical altercations 'going on for a while' " between herself and the father. Olivia further stated that (1) the father had slammed and broken her computer during the prior evening and (2) the father had " 'anger issues.' "

The father's initial explanation of the events preceding Olivia's arrival at CCMC was that (1) "Olivia was 'being mean to [the] mother, swearing and giving [the] mother] the finger,' " (2) there was a "verbal altercation" about Olivia finishing her schoolwork, and (3) the father " 'lost his shit' and pushed Olivia into a closet where she fell and tried to get [up] and fell again a few times." In subsequent communications, however, the respondents stated that the father's physical altercation with Olivia that resulted in her injuries "occurred as a reaction to protect [one of Olivia's younger brothers] from [her]." The father stated that, in the moment, "he felt as though he had 'no other choice' " and admitted to physically injuring Olivia. The mother, who was present at the time of the incident but did not intervene to protect Olivia, supported the father's account of the incident, "stating that [the] [f]ather stepped in to 'protect [Olivia's younger brother],' and that Olivia ha[d] a recent history of aggressive and threatening behavior."[4]

On November 4, 2021, the respondents presented a safety plan that included (1) Olivia being discharged from CCMC into the mother's care and (2) the father leaving the family home temporarily. Olivia was discharged from CCMC on the same day. Later that evening, the mother contacted a department social worker "insist[ing] that [the] [f]ather and Olivia have contact [that night] despite Olivia's protest, due to th[e] situation being difficult for [the] [f]ather." The next day, Olivia reported that the father was present in the family's car when she was discharged from CCMC. The father later (1) told a department social worker that, notwithstanding the safety plan, he did not leave the family home until 11:45 p.m. on November 4, 2021, after

Olivia had fallen asleep, and he returned to the home at 4:45 a.m. the following morning, before Olivia had woken up for school, (2) requested that the department or another agency visit the family home to review the respondents' rules with Olivia and to direct her to abide by them, and (3) asserted that the safety plan would not be successful because (a) the mother was afraid to be in the family home alone with Olivia and her two brothers and (b) he was unable to spend a significant amount of time outside of the home. On November 5, 2021, following a safety assessment, the department determined Olivia's situation was unsafe as a result of (1) the respondents' violation of the safety plan, (2) the mother's inability to maintain boundaries between Olivia and the father, and (3) the father's statements questioning the viability of the safety plan.

The trial on the neglect petition spanned twenty days between May 26 and December 14, 2022. Numerous witnesses testified at trial, including medical personnel, department personnel, and the respondents, and the court, *Hon. Stephen F. Frazzini*, judge trial referee, admitted many exhibits in full into the record. Each respondent was represented by an attorney until November 29, 2022, the fourteenth day of trial, when, during their case-in-chief,[5] the respondents filed appearances in lieu of their respective attorneys and proceeded to represent themselves for the remainder of trial.[6]

On December 5, 2022, while the neglect trial was ongoing, the petitioner filed an emergency motion for an evidentiary hearing and an order authorizing the department to make medical, psychological, and educational decisions on behalf of Olivia (emergency motion). On December 8, 2022, after conducting an evidentiary hearing on December 7, 2022, and hearing argument from the parties, the court granted the emergency motion.[7]

On December 14, 2022, the evidentiary portion of the neglect trial was concluded and the court heard closing arguments from the parties. Thereafter, the court issued an oral decision on the record adjudicating Olivia to be neglected and committing her to the custody of the petitioner.[8] This appeal followed.[9] Additional procedural history will be set forth as necessary.

The self-represented respondents on appeal raise various claims, which we distill to be that (1) there was insufficient evidence to support the court's neglect determination, (2) the court incorrectly determined that it was in Olivia's best interest to commit her to the custody of the petitioner, and (3) they "were denied equitable treatment" because of a litany of procedural or evidentiary errors that purportedly occurred during the neglect proceedings. We address these claims in turn.

Before examining the respondents' claims, we observe that, "[a]lthough self-represented parties are not excused from complying with relevant rules of procedural and substantive law, [i]t is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the [self-represented] party. . . . Thus, like the trial court, [this court] will endeavor to see that such a litigant shall have the opportunity to have his case fully and fairly heard so far as such latitude is consistent with the just rights of any adverse party. . . . Nonetheless, [a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law . . . and [w]e repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Citations omitted; internal quotation marks omitted.) *Randolph* v. *Mambrino*, 216 Conn. App. 126, 151–52, 284 A.3d 645 (2022).

I

We first address the respondents' claims that (1) there was insufficient evidence to support the trial court's neglect determination and (2) the court improperly determined that it was in Olivia's best interest to be committed to the custody of the petitioner. We are not persuaded.

"Neglect proceedings, under . . . [General Statutes] § 46b-129, are comprised of two parts, adjudication and disposition. . . . The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence." (Internal quotation marks omitted.) *In re Ja-lyn R.*, 132 Conn. App. 314, 318, 31 A.3d 441 (2011).

A

The respondents assert that the court's determination that Olivia was neglected was not supported by sufficient evidence. We do not agree.

"During the adjudicatory phase, the court determines if the child was neglected. Practice Book § 35a-7 (a) provides in relevant part: In the adjudicatory phase, the judicial authority is limited to evidence of events

preceding the filing of the petition or the latest amendment. . . . [General Statutes § 46b-120 (4)] provides that a child may be found neglected if the child is being denied proper care and attention, physically, educationally, emotionally or morally, or is being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . .

"When considering a challenge to the sufficiency of the evidence, the function of an appellate court is to review the findings of the trial court, not to retry the case. . . . [W]e must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Citation omitted; internal quotation marks omitted.) Id., 318–19.

During the adjudicatory phase, the court stated in relevant part as follows. "[T]he evidence established [that] in October of 2021 Olivia told authorities at school that [the] father 'becomes physical' toward her. The evidence shows that at times she was distraught and in distress and expressing suicidal thoughts and feelings as a result of [the] father's treatment of her. She told her counselor at school on October [21, 2021] that [the father] would throw objects at her and call her a 'disgrace' and 'retarded.'

"[The department] was in the process of investigating that report when it received a report from [CCMC] . . . on November [2, 2021] that . . . the father had dropped Olivia off at [CCMC]; that she had multiple bruises and abrasions on her arms, legs, back, and head; and that she had told [CCMC] staff that [the] father had beaten her up and 'stomped on her.' . . .

"[The father] himself told [CCMC] staff that he had . . . intervened in a dispute between Olivia and [the] mother, and he had 'lost,' 'his,' 'shit' and pushed [Olivia] in a closet. . . .

"At trial [the mother] testified that [the father] had intervened during an incident in which Olivia had been threatening a younger brother with a sharp object and that the father had pushed her into a closet, that she had fallen to the floor after slipping on a dog bed near the closet. But the mother denied that the father had neglected or improperly harmed [Olivia] . . . [and] basically said that all his actions that day were justified and necessary.

"[The father] . . . did testify [at trial] but didn't discuss what happened in the incident. I'm not going to

hold . . . his failure to discuss that against him. . . .

"[T]he essential issue here for adjudicatory purposes is whether the physical conduct of the father and the mother's inaction during that conduct was reasonable or, while taking into consideration the [respondents'] constitutionally protected right to care for their child, excessive. And the courts have long recognized that there's no precise rule about what is excessive physical discipline. Each case must be examined on its own facts.[10]

"So the evidence the court . . . has here about the injuries and what happened are the medical reports; the testimony of the father and [the] mother . . . the testimony from [Greyson Houle] the investigative social worker and [an] investigat[ion] protocol he wrote; information that's in [a] social work affidavit . . . introduced into evidence here that was used in support of the [order of temporary custody]; and photographs of the bruises and abrasions that were taken at [CCMC]. And I've looked at those photographs. They show bruises, abrasions on [Olivia's] arms, legs, head, shoulders, neck.

"At one point during the trial, the [respondents] also introduced into evidence the boots that were being worn [on November 2, 2021] by the father. [The mother] said that the marks on Olivia's body would not correspond . . . to the toes on the boots. But I've looked at the treads on the father's boots, and on at least two of the photographs there are marks on Olivia's body that correspond to the type of mark that could be left by a tread, but . . . I didn't measure them . . . . I don't accept the mother's statement that those marks . . . don't show that the injuries were caused by his boots. [Olivia] at [CCMC] said that [the] father stomped on her.

"Now, there's also evidence that Olivia can become impulsive, that she can lose self-control. There's evidence that she's acted in a threatening manner towards other people, and it was argued by the [respondents] that Olivia was acting in a way to hurt her brother. The father at [CCMC] said that he had lost his shit, and . . . I regard that as an admission by him effectively that he had lost control of his actions that day while inflicting these injuries on Olivia. And they refute the mother's testimony that his actions were justified and necessary. That type of remark is the remark of somebody acknowledging that they lost self-control.

"I don't intend to discuss in great detail an analysis of the injuries, but the evidence does show that the physical injuries inflicted on Olivia that day were excessive. They exceeded the bounds of the [respondents'] lawful right to protect other children or to discipline and parent Olivia; that both [respondents] denied [Olivia] proper care and attention during this incident and the

days preceding when the father had disciplined [Olivia] and the mother did not take action to protect [Olivia]; and that [Olivia] was living under conditions injurious to her well-being.

"And I therefore find neglect, as pleaded and proven by a fair preponderance of the evidence." (Footnote added.)

After a careful review of the record, we conclude that the court's factual findings with regard to its neglect determination were supported by sufficient evidence in the record, including but not limited to medical records, Houle's testimony and his investigation protocol, and the photographs depicting Olivia's injuries.[11] We further conclude that, as a matter of law, the facts properly found by the court, which demonstrate that (1) prior to November 2, 2021, the father had physical altercations with Olivia and verbally demeaned her, (2) on November 2, 2021, after, in his own words, having "lost his shit," the father inflicted excessive physical injuries on Olivia, and (3) the mother did not intervene to protect Olivia, were sufficient to support the court's neglect determination.

In sum, we conclude that the court did not commit error in adjudicating Olivia to be neglected.[12]

B

The respondents also assert that the court incorrectly determined that committing Olivia to the custody of the petitioner was in her best interest. We disagree.

"[W]hen making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . .

"After an adjudication of neglect is made, a court may (1) commit the child to the [petitioner], (2) vest guardianship in a third party or (3) permit the parent to retain custody with or without protective supervision. General Statutes § 46b-129 (j)." (Citation omitted; internal quotation marks omitted.) *In re Ja-lyn R.*, supra, 132 Conn. App. 323. "In determining the disposition portion of the neglect proceeding, the court must decide which of the various custody alternatives are in the best interest of the child. To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will

foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [the child's] environment." (Internal quotation marks omitted.) Id., 323–24.

During the dispositional phase, the court stated in relevant part as follows. "In making a decision about [Olivia's] best interest, the court has to use its own broad discretion to choose . . . the placement that will best foster [her] interest in sustained growth, development, and well-being. . . . [T]his is an inherently flexible and fact-specific standard. It gives the court broad discretion to consider all the different and individualized facts that may affect a specific child's welfare. . . .

"Evidence shows that Olivia has many serious mental health and behavioral health problems. In the thirteen months since removal from [the respondents], she has been hospitalized several times for emergency situations; she's need[ed] partial hospitalization and intensive outpatient services; and she's been, since May of [2022], in the adolescent unit of the Manchester Memorial Hospital [(hospital)]. For many months she was on a waiting list for admission to a higher level of care at a psychiatric residential treatment facility, PRTF. She needs long-term, intensive care and therapy to help her learn how to control and manage her moods, emotions, and behaviors.

"The [respondents] urge that they know what is best for Olivia; that they've historically used and would still use a system of rewards, structure, and discipline to help Olivia manage her emotional and behavioral difficulties if she were returned home. And they believe that she needs continued inpatient treatment in the interim before she returns home. But the evidence shows that, while Olivia was hospitalized at [the hospital], the [respondents] did not act in her best interest. [The respondents'] distrust of [the department] is so great that it led them to make decisions that were detrimental to Olivia. They rescinded the releases that would have enabled Olivia's treatment providers to communicate with [the department]. Doing so led to Olivia being kept at [the hospital] when that facility was no longer appropriate [for] her. It prevented her from being admitted to a PRTF. It caused distress to Olivia, and it harmed her emotionally and physically. I'm horrified to learn that she may even now be a diabetic.

"Moreover, the evidence shows that Olivia did not know that it was [the respondents'] decision-making that was causing her to languish in the [hospital]. And while it's probably appropriate that children and youths not be aware of all the factors leading to their parents' decision-making, in this particular instance that lack of knowledge probably played a part in the fact that [Olivia] blames [the department] for keeping her from her family when, in fact . . . if [the respondents] had not rescinded the releases, she may well have been now

back in the community if she had been admitted to the PRTF [in] May [of 2022], received treatment there enabling her to regulate her emotions and behaviors, and if [the respondents], as part of the family work at PRTF, had become better able to manage and parent her safely and appropriately, maybe even back with [the respondents].

"[Olivia's] lawyer advocated forcefully and eloquently on her behalf that Olivia trusts [the respondents] to make all her decisions and wants [the respondents] to be her advocates. And usually those are feelings and beliefs that are healthy to children because a child or a youth needs to be able to feel that their caregiver will take care of them and keep them safe and will allow them increasing amounts of independence as it becomes appropriate, based on the child's development. But here, [Olivia's] trust in [the respondents'] decision-making is not informed by the decisions the [respondents] made here.

"I also have to consider the fact about the events that led to Olivia being removed from [the respondents'] custody. [The father] engaged in excessive and harmful physical punishment and interactions with [Olivia], and [the] mother did not intervene. . . . [T]he mother's testimony about that event can only lead to the conclusion that she approved of [the father's] conduct during that incident.

"[The father] then took [Olivia] to [CCMC] and, even while she was feeling suicidal, left her there. But a child in the emotional state that the evidence shows that Olivia was in when she was taken to [CCMC] needed a parent there with her. There's been no evidence presented that the father or [the] mother understood the gravity of what happened in their home or in the father's decision to leave Olivia by herself at [CCMC] or that [the respondents have] taken any steps to address the inadequacies and deficiencies in their parenting of [Olivia].

"The evidence shows and I'm fully persuaded that [the respondents] both love [Olivia] dearly. The evidence shows that Olivia can be very difficult to manage, both in terms of her emotions and behaviors. But, unfortunately, there's no evidence to conclude that if Olivia once again became emotionally distraught or even if she became physically out of control that the [respondents] would not again respond in a similar manner. If Olivia can become impulsive, if she sometimes lacks emotional and behavioral self-control, the evidence shows, at least on the incident on November [2, 2021], that the father acted similarly, causing injuries to her with the acquiescence and passive acceptance of the mother.

"There's also evidence that [the father] talked harshly and demeaningly to Olivia when she was hospitalized. And there's only limited amounts of evidence about

those interactions, so I don't have a lot of information about them. I recognize that [Olivia] was distraught at times [at] the hospital . . . [and] that she can be troubling and difficult to interact with, so I'm not drawing the worst of conclusions about the evidence about what the father is reported to have said. But from the evidence about what he said . . . I do conclude that the rosy depiction that the [respondents] present of their actions, of their interactions and relationship with Olivia does not accurately portray the fact that their relationship and their interactions with her are in serious need of repair and need extensive professional assistance and guidance.

"For example, although [the father] testified that he had participated in and successfully completed parenting classes, and although [a] social study [admitted into evidence] reports that he was in therapy, the court concludes that both [respondents], as of the end of trial, still need more professional assistance in learning how to interact appropriately and safely with [Olivia].

"So, despite the love that is manifest and has been manifest on every single minute of this trial, that the [respondents] have displayed . . . [and] I've no doubt that they're dedicated to [Olivia], but I also have no doubt here that [Olivia's] best interest lies in her being committed to the [petitioner], which . . . I find to be in her best interest and order that as the disposition in this case."[13]

Upon a careful review of the record, we conclude that the court reasonably determined that it was in Olivia's best interest to commit her to the custody of the petitioner. In support of this determination, the court found that (1) Olivia suffers from severe mental health and behavioral problems that require long-term intensive care and therapy, (2) the respondents engaged in conduct that was detrimental to Olivia's well-being following her hospitalization in May, 2022, particularly by rescinding medical releases, which (a) prevented the department from communicating with Olivia's treatment providers and (b) extended Olivia's hospitalization when other treatment was more appropriate, and (3) notwithstanding the father's completion of parenting classes and his participation in therapy, the respondents' relationship with Olivia is fractured, as evidenced by (a) the father's physical actions toward Olivia committed with the mother's approval, (b) the father's decision to leave Olivia alone at CCMC on November 2, 2021, and (c) the father demeaning Olivia verbally during her hospitalization. The court also expressed concern that, with the mother's acquiescence, the father again would react in a physical manner toward Olivia if a situation similar to the incident on November 2, 2021, occurred in the future. These findings were supported by sufficient evidence in the record, including but not limited to the testimony of medical personnel, department personnel,

and the guardian ad litem appointed in this action, and the court reasonably relied on these findings to determine that committing Olivia to the petitioner's custody was in her best interest.[14]

In sum, we conclude that the court did not abuse its discretion in committing Olivia to the custody of the petitioner.[15]

## II

We next address the respondents' claim that they "were denied equitable treatment" stemming from numerous procedural or evidentiary errors that purportedly occurred during the neglect proceedings. The petitioner maintains that this claim, including its various subparts, is inadequately briefed, and, therefore, we should decline to review it. For the reasons that follow, we conclude that (1) parts of this claim have been abandoned as inadequately briefed and (2) the remaining parts of this claim lack merit.

We iterate that self-represented parties, like the respondents, are not relieved of the obligation to adequately brief their claims on appeal. See *Randolph* v. *Mambrino*, supra, 216 Conn. App. 151–52; see also *Traylor* v. *State*, 332 Conn. 789, 807, 213 A.3d 467 (2019) ("[t]he solicitous treatment we afford a self-represented party does not allow us to address a claim on his behalf when he has failed to brief that claim"). Insofar as the respondents have adequately briefed claims of evidentiary errors, "[t]he court's evidentiary rulings must be viewed in the context of the proceedings. . . . The trial court has broad discretion in ruling on the admissibility of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion . . . ." (Citation omitted; internal quotation marks omitted.) *In re Ryan C.*, 220 Conn. App. 507, 535, 299 A.3d 308, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023). Mindful of these principles, we turn to the alleged errors identified by the respondents.

The respondents contend that the court improperly precluded them from submitting into evidence (1) certain audio recordings and (2) an email chain, which, they argue, "resulted in an incomplete submission of relevant facts" and prevented them from receiving a "fair judgment." The record reveals, however, that the proposed evidence in question either (1) was not offered properly by the respondents or (2) was ruled by the court to be inadmissible, which the respondents do not address in their appellate brief. Moreover, beyond their bald assertion of harm, the respondents do not explain how the exclusion of this evidence was harmful to them. See *In re Nevaeh G.-M.*, 217 Conn. App. 854, 885–86, 290 A.3d 867 ("[i]t is well settled that even if [an evidentiary error is proven], the [party challenging the ruling] must also establish that the rul-

ing was harmful and likely to affect the result of the trial" (emphasis omitted; internal quotation marks omitted)), cert. denied, 346 Conn. 925, 295 A.3d 418 (2023). Accordingly, we deem this claim to be abandoned.[16]

The respondents also assert that the court impermissibly curtailed their right to recall witnesses during their case-in-chief, notwithstanding that they had "reserve[d]" such a right earlier in the trial. The record reveals that, during trial on December 13, 2022, the court declined the respondents' requests to recall Houle or Jilienne Charter, an ongoing department social worker, both of whom had been called as witnesses during the petitioner's case-in-chief and both of whom the respondents had the opportunity to cross-examine while represented by counsel. The court reasoned that the questions that the respondents sought to ask Houle and Charter could have been posed to them on cross-examination and were not relevant. The respondents fail to address the court's rationale for these evidentiary rulings in their appellate brief. Therefore, we conclude that the respondents have abandoned this claim.[17]

We next turn to the respondents' claim that the court improperly failed to "invalidate" a hospital record admitted into evidence that the petitioner allegedly had "inappropriately obtained . . . ." The record reveals that, during trial on December 13, 2022, the petitioner offered into evidence a hospital record, to which the respondents objected on the grounds of hearsay and undue prejudice. The court overruled the respondents' objections and admitted the hospital record in full into the record. The next day, the father indicated to the court that he believed that the hospital record should not have been admitted into evidence because it was not "authentic." Specifically, the father argued that the petitioner's counsel had obtained the hospital record "illegally" because she did not have access to the record at the time of the "run date" printed on the record, which was September 8, 2022. The petitioner's counsel represented that she had gained authorization to obtain the hospital record. The court proceeded to determine that the father had not raised a viable objection challenging the hospital record's authenticity. The court further stated that "[the father does not] think [that the petitioner's counsel] obtained the [hospital record] properly. And that's not something that I'm prepared to address here today; I don't think it's within the Superior Court's concern in the trial of this case." The respondents on appeal have failed to present any substantive legal analysis addressing the court's reasoning or supporting their position that the hospital record should have been "invalidate[d]." Accordingly, we conclude that the respondents have abandoned this claim.

In addition, the respondents assert that the court impermissibly declined an oral request by the father on November 29, 2022, made after he had filed an appear-

ance in lieu of his former attorney, to permit his former attorney to remain available to him as an "advisory counsel." The court construed the father's statement to be requesting hybrid representation, which the court denied. The respondents have failed to provide any meaningful legal analysis in support of this claim, and, therefore, we deem it to be abandoned.

The respondents also contend that the court improperly declined the father's offer to introduce into evidence an audio recording of an incident that occurred outside of the courtroom on November 29, 2022, the fourteenth day of trial. The record reflects that, during a recess on that day, the court was informed by a judicial marshal that an incident had occurred outside of the courtroom involving the father and the petitioner's counsel. Following the recess, the petitioner's counsel represented to the court that, during the recess, in view of several others, the father threatened her, which led to the intervention of three judicial marshals. The petitioner's counsel requested that, in light of the father's threatening statements, the remainder of the trial be conducted virtually following the conclusion of the proceeding that day. Over the respondents' objection,[18] the court granted that request.[19] Subsequently, on December 14, 2022, the last day of trial, before he had resumed his cross-examination of a witness following a recess, the father (1) asked the court to articulate what it believed he had said to the petitioner's attorney on November 29, 2022, to purportedly threaten her and (2) indicated that he had an audio recording of the incident, which, he posited, would verify that he did not say anything threatening to the petitioner's counsel. The court responded that the father had not "raised anything that [it] should address here" and directed the father to resume his cross-examination of the witness. The respondents argue on appeal that, to their "gross disadvantage . . . the court again abridged [them], based on an unfounded complaint and [they] were denied their . . . right [under the fifth amendment to the United States constitution] to face their accusers and to possible rebuttal." On the basis of the record, we conclude that the court acted reasonably in declining, on the last day of trial, to entertain additional argument or to hear evidence in relation to its ruling on November 29, 2022, switching the format of trial from in person to virtual.[20]

We next address the respondents' assertion that the court impermissibly denied a motion for a continuance that they filed on December 12, 2022, the eighteenth day of trial. The record reflects that, on December 8, 2022, after having granted the emergency motion, the court ordered that it would permit three additional days for trial on the neglect petition, concluding on December 14, 2022, with the respondents afforded two of those days to continue presenting their evidence, and that trial dates previously scheduled for January, 2023, were

stricken. On December 12, 2022, the respondents moved for a continuance to allow them to retain new counsel. In support of the motion, the father argued in part that the respondents were disadvantaged by the court's new scheduling order entered on December 8, 2022, which limited their time to prepare for trial. The court denied the motion for a continuance, reasoning that (1) Olivia's needs required the neglect proceedings to be completed promptly, (2) trial had been ongoing since May, 2022, and (3) it had canvassed the respondents when they elected to represent themselves on November 29, 2022, and cautioned them about the perils of self-representation. The respondents maintain on appeal that they were prejudiced by the court's denial of their motion for a continuance, as they were "forc[ed] . . . to conclude their case-in-chief more than one month earlier than initially scheduled . . . ." On the basis of the record, we conclude that the court properly exercised its discretion to deny the motion for a continuance.[21] See *In re Shaquanna M.*, 61 Conn. App. 592, 604, 767 A.2d 155 (2001) ("Decisions to grant or to deny continuances are very often matters involving judicial economy, docket management or courtroom proceedings and, therefore, are particularly within the province of a trial court. . . . Whether to grant or to deny such motions clearly involves discretion, and a reviewing court should not disturb those decisions, unless there has been an abuse of that discretion, absent a showing that a specific constitutional right would be infringed." (Citation omitted.)).

The respondents also contend that the court improperly prevented them, during their case-in-chief, from seeking to present as witnesses two CCMC employees to whom the father had spoken when he brought Olivia to CCMC on November 2, 2021, and who, according to the respondents, would have provided testimony that contradicted other evidence regarding statements made by the father. The evidence that the respondents sought to discredit included Houle's investigation protocol, which was admitted as a full exhibit on July 12, 2022, and which documented statements made by the two CCMC employees.[22] The record reveals that, during trial on December 13, 2022, the respondents notified the court that they had submitted to the court a request to subpoena the two CCMC employees on December 12, 2022, to which the court responded: "Well, I told [you that] today is the last day for you to present evidence. So . . . it's a little late for that." The respondents argue that "the judge decided [that] it was more important to finish the trial than to allow the respondents to present testimony and rebuttal evidence from these two declarants . . . ." We conclude that the court acted reasonably in precluding the respondents, on the last day of their case-in-chief, from seeking to call the two CCMC employees as witnesses.

In addition, the respondents claim that they "were

placed in an ambush situation, which the court allowed," in three ways. First, the respondents contend that the court improperly made comments that "prompt[ed]" the petitioner to file the emergency motion on December 5, 2022. This contention is not supported by the record.[23] Second, the respondents assert that, during the evidentiary hearing on the emergency motion, the court improperly permitted the petitioner to call certain witnesses notwithstanding that the petitioner had failed to disclose them in advance of the hearing. The court rejected this argument after the father had raised it at the evidentiary hearing, reasoning that the argument did not present "any impediment to our proceeding on the [emergency] motion." The court maintained the discretion to allow testimony from the undisclosed witnesses; see *Natarajan* v. *Natarajan*, 107 Conn. App. 381, 389–90, 945 A.2d 540 (trial court did not abuse its discretion in admitting testimony of witness who had not been disclosed prior to trial), cert. denied, 287 Conn. 924, 951 A.2d 572 (2008); and we conclude that the respondents have failed to demonstrate that the court abused its discretion in this regard. Third, the respondents contend that the court improperly permitted the petitioner to offer certain evidence into the record that the mother did not receive in advance of the evidentiary hearing. The record reflects that, during the evidentiary hearing, the mother alerted the court that she had not received a certain document, which the petitioner was seeking to offer into evidence, notwithstanding the representation of the petitioner's counsel that the document had been emailed to her. Following additional discussion, it was discovered that the petitioner's counsel had emailed the document to an outdated email address of the mother. After that discovery, the petitioner's counsel represented that she would email the document to the mother's current email address immediately. Under these circumstances, we conclude that the court did not abuse its discretion in permitting the petitioner to submit evidence that the mother had not received in advance of the emergency hearing.

The respondents also claim that they "were not given equitable access to [department] records" despite having submitted certain records requests to the department. The record reflects that, on December 12, 2022, the respondents sought a continuance of the trial on the basis that the department had failed to respond to certain records requests. The petitioner's counsel represented that she was unaware of any such requests. The court declined to grant a continuance, but it ordered the respondents to provide immediately a list of the records that they were seeking to the petitioner's counsel, whom the court ordered "to notify her client to obtain [the records] and provide them to [the respondents] as expeditiously as possible." On the basis of the record, insofar as the respondents claim that they

were denied access to the records in question, this claim is untenable because the court, in fact, ordered the petitioner to provide the records to the respondents, and at no point during the remainder of the trial did the respondents indicate to the court that the petitioner had failed to comply with the court's order.[24]

Last, we address two claims of error raised by the respondents with respect to actions taken by Judge Dannehy, both of which warrant little discussion. First, the respondents assert that, during a hearing held on December 21, 2021, without the respondents present, Judge Dannehy engaged in ex parte communications with the petitioner and with a department social worker. The transcript of the December 21, 2021 hearing reflects that the proceeding held on that day concerned neglect petitions filed as to Olivia's two brothers. Thus, any claimed error regarding the December 21, 2021 hearing is outside of the scope of this appeal. Second, the respondents assert that, notwithstanding having "recused himself" from participating in the underlying proceedings, Judge Dannehy improperly ruled on the emergency motion. The record reflects that Judge Dannehy presided over pretrial proceedings in the underlying action and commented to the parties on the record on April 29, 2022, that another judge would preside over the trial on the neglect petition because "at this point [he had] gone too far into the case." In addition to presiding over the trial, Judge Frazzini conducted the evidentiary hearing on the emergency motion and ultimately granted the motion. At the outset of the evidentiary hearing, Judge Frazzini noted that "[t]he hearing was ordered for this morning. Judge Dannehy granted preliminary relief prior to . . . the hearing . . . ." On the basis of the record, the respondents have failed to demonstrate any impropriety committed by Judge Dannehy.

The judgment is affirmed.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** January 4, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] This appeal was filed by the father only. On October 11, 2023, the respondents filed a motion to permit the mother to join the appeal as an appellant, which we granted on the same day.

[2] For ease of discussion, we address the respondents' claims in a different order than they are set forth in their appellate brief.

[3] The petitioner alleged that Olivia was found to have (1) " 'a patch of red marks on the right side of her scalp from where [she] reported [the] [f]ather pulling her hair,' " (2) " 'a 2 [centimeter] abrasion to her right eye on the outside near her eyebrow,' " (3) " 'a 2 [centimeter] x 1 [centimeter] abrasion to [the] right side of her neck,' " (4) " 'large patches of redness and bruising to her upper back shoulder,' " (5) " 'bruising on her upper and lower right arms [and] multiple linear abrasions on her left upper arm,' " and (6) " 'older brownish bruises on her body.' "

[4] The petitioner further alleged that (1) Olivia's two younger brothers were present in the family home at the time of the incident between Olivia and the father on November 2, 2021, (2) both brothers reported hearing the

incident, which included the father threatening to remove Olivia from the family home, and observing portions of the incident, (3) one of the brothers reported going to his bedroom because he " 'didn't want to see what happened next,' " and (4) the other brother reported that the November 2, 2021 incident was "the second time something like this ha[d] occurred between Olivia and [the] [f]ather . . . ."

[5] The petitioner rested her case-in-chief on October 14, 2022, the tenth day of trial.

[6] After having canvassed the respondents, the court accepted their respective decisions to represent themselves and determined that each respondent had knowingly, intelligently, and voluntarily waived his or her right to counsel.

[7] During trial on December 13, 2022, the court ruled that, in lieu of the petitioner presenting rebuttal evidence, the court would incorporate the evidence admitted during the evidentiary hearing on the emergency motion into the record for the neglect proceedings.

[8] On June 6, 2023, the respondents filed a notice pursuant to Practice Book § 64-1 requesting that the trial court file a signed transcript of its oral decision issued on December 14, 2022. On June 7, 2023, the court filed a signed transcript of its decision.

[9] The attorney for Olivia has adopted the petitioner's appellate brief.

[10] The trial court cited this court's decision in *Lovan C.* v. *Dept. of Children & Families*, 86 Conn. App. 290, 860 A.2d 1283 (2004), for the proposition that "[t]here exists a parental right to punish children for their own welfare, to control and restrain them and to adopt disciplinary measures in the exercise of that right . . . . Limits on the right of parents to punish their children do, however, exist. The common law rule and the provisions of [General Statutes (Rev. to 2003)] § 53a-18 (1) require that the use of physical force administered upon a minor child be reasonable. . . . Whether that limit has been reached in any particular case is a factual determination to be made by the trier of fact." (Citation omitted; internal quotation marks omitted.) Id., 299.

[11] The respondents challenge the court's factual finding that the father stated, at CCMC on November 2, 2021, that he "lost his shit" during the physical altercation with Olivia on that day, asserting that (1) the father did not make that statement and (2) there was no evidence demonstrating that he made that statement *at CCMC*. The record supports the court's finding that the father made the statement at issue. Ann Gorjanc, a pediatric physician's assistant at CCMC, testified during trial that the father told her, during a telephone conversation, that he "lost his shit and he pushed [Olivia] in the closet," which statement to Gorjanc was also documented in (1) notes prepared by Gorjanc that were a part of medical records and (2) Houle's investigation protocol, both of which were admitted in full into evidence. In addition, Jilienne Charter, an ongoing department social worker, testified during trial that the father had "reported to the department [that] he lost his shit and . . . physically put his hands on [Olivia] . . . ." Insofar as the record does not reflect that the father made the statement *at CCMC*, we cannot discern any harm stemming therefrom. See *DiNapoli* v. *Doudera*, 28 Conn. App. 108, 112, 609 A.2d 1061 (1992) ("[w]here . . . some of the facts found are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole"). On the basis of the court's decision, the court considered the father's statement itself to be relevant, not the location where the statement was made.

Insofar as the respondents maintain that other factual findings by the court with respect to its neglect determination were clearly erroneous, as we explain in this opinion, the record supports the court's findings.

[12] The respondents raise a number of discrete arguments that we discern to be directed to the court's neglect adjudication and that, in essence, ask this court to reweigh the evidence in the record in their favor. "This we will not do, as it is not the function of a court of review to retry the facts." *In re Kamari C-L.*, 122 Conn. App. 815, 826, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010).

The respondents also argue that the ninety-six hour hold and the order of temporary custody "were authorized without a complete investigation." In *In re Carl O.*, 10 Conn. App. 428, 523 A.2d 1339, cert. denied, 204 Conn. 802, 525 A.2d 964 (1987), and cert. denied, 204 Conn. 802, 525 A.2d 964 (1987), an appeal in part from an order of temporary custody, this court held that the appellants' claim of error as to the order of temporary custody was moot because the order of temporary custody had expired when the

child was adjudicated to be uncared for and committed to the petitioner's custody. Id., 433–34; see also *In re Forrest B.*, 109 Conn. App. 772, 776, 953 A.2d 887 (2008) ("[o]ur case law specifically conceives of appeals from temporary custody orders as moot when the children involved are adjudicated neglected"). Thus, if the respondents are attempting to argue, following the neglect determination, that the order of temporary custody constituted error, then that argument is not viable. If, in the alternative, the respondents' argument is directed to the propriety of the court's neglect determination, then we are not persuaded that it undermines that determination.

[13] The court also adopted specific steps, which previously had been ordered, to facilitate reunification between Olivia and the respondents.

[14] The respondents challenge certain factual findings made by the court during the dispositional phase, citing evidence in the record purportedly contradicting the court's findings. We iterate that "[w]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Internal quotation marks omitted.) *In re Ja-lyn R.*, supra, 132 Conn. App. 319; see also *In re Quidanny L.*, 159 Conn. App. 363, 375, 122 A.3d 1281 ("[i]t is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses" (internal quotation marks omitted)), cert. denied, 319 Conn. 906, 122 A.3d 639 (2015). As we conclude in this opinion, the court's factual findings in support of its dispositional determination were supported by evidence in the record, and, therefore, we decline to disturb them.

[15] As with the court's neglect determination; see footnote 12 of this opinion; the respondents raise discrete arguments that we construe to be directed to the court's dispositional determination and that, in substance, ask this court to reweigh the evidence in the record in their favor. "This we will not do, as it is not the function of a court of review to retry the facts." *In re Kamari C-L.*, supra, 122 Conn. App. 826.

In addition, we note that, at the outset of the dispositional phase, the court stated that "placing guardianship in a third party is not really—there's no evidence to support that here, and the practical alternatives are whether to commit [Olivia] to [the petitioner] or [to] place [Olivia] back with the [respondents] under protective supervision." The respondents assert that the court "should have taken the initiative to bring this consideration for a third-party disposition to light," as they were unaware that placing guardianship in a third party was a dispositional option. The respondents have not presented any substantive legal analysis in support of this claim, and, therefore, we deem it to be abandoned. See *Randolph* v. *Mambrino*, supra, 216 Conn. App. 151–52.

[16] The respondents further assert that the court impermissibly denied them the ability to mark exhibits for identification only. In support of this claim, the respondents cite to portions of the trial transcripts; however, none of these transcript excerpts reflects a request by the respondents that an exhibit be marked for identification only and the court refusing such a request. One of the aforementioned excerpts establishes that during trial on December 13, 2022, the court explained to the respondents the difference between full exhibits and exhibits for identification only, and that exhibits contained in a party's exhibit list indicate exhibits that the party intends to offer, but such exhibits are not part of the record until they are presented to the court. Moreover, the record demonstrates that the court admitted several exhibits in full offered by the father after the respondents began representing themselves in the underlying action.

In addition, the respondents make isolated assertions that (1) they were not granted access to electronic filings in the neglect proceedings because they were self-represented parties and (2) they were required at a certain point to submit exhibits to the trial court clerk in person, notwithstanding that they previously had been permitted to submit exhibits via fax. Insofar as these are cognizable claims of error, these standalone contentions are not supported by any substantive legal analysis, and, therefore, we deem them to be abandoned.

[17] The respondents separately contend that the court improperly precluded them from introducing into evidence an audio recording of a conversation involving Charter that purportedly contradicted a portion of her testimony at trial. On the basis of the record, we construe the court as having determined such evidence to be irrelevant, which the respondents also fail to address in their appellate brief.

[18] The guardian ad litem and Olivia's attorney did not object to the request.

[19] After indicating that it had received the report of the incident from the

judicial marshal, the court commented: "I'm certainly not going to consider that report in making my decision about this case, but I want the lawyers to feel safe as they try this matter before me . . . ."

[20] Insofar as the respondents attempt to claim that their constitutional rights were infringed by the virtual format of trial following the court's ruling on November 29, 2022, the respondents' appellate brief is bereft of any substantive legal analysis on that issue, and, therefore, we conclude that the respondents have abandoned any such claim.

[21] The respondents also assert that they "were forced to abide by" the court's granting of the emergency motion on December 8, 2022, "under duress." Insofar as this constitutes a cognizable claim of error, other than baldly asserting a violation of their constitutional rights, the respondents fail to set forth any substantive legal analysis in support of this claim. Therefore, we conclude that the respondents have abandoned this claim.

[22] The investigation protocol reflected that (1) one of the CCMC employees told Houle that, on November 2, 2021, the father (a) brought Olivia into CCMC, "pushing her towards the [reception] window and announced that he was [there] to 'drop her off for the [s]tate' and that he 'never wanted to see her again,' " and (b) refused to provide consent for Olivia to be treated, and (2) the other CCMC employee told Houle "that the father stated that he wanted to 'relinquish his rights.' "

[23] The respondents point to comments that the court made during trial on November 30, 2022, (1) indicating that it wanted the parties to meet with a court services officer to "streamline . . . the court process," and (2) stating, in response to a question asked by the attorney for Olivia, that it would not rule out entering ex parte orders if such relief was sought pursuant to the rules of practice. These comments do not amount to the court "prompting" the petitioner to file the emergency motion.

[24] For the first time on appeal, the respondents assert that "[p]ortions of [their records] request still were not fulfilled prior to the disposition [of the neglect proceedings], despite the judge's order." The respondents failed to present this claim to the trial court, and, therefore, it is not preserved for appellate review. See *In re Marie J.*, 219 Conn. App. 792, 816, 296 A.3d 308 (2023) ("[A]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court." (Internal quotation marks omitted.)). Even if the respondents had preserved this claim, they have not identified the records that they claim not to have received, thereby leaving us to speculate as to the harm stemming therefrom. See *In re Kiara Liz V.*, 203 Conn. App. 613, 624, 248 A.3d 813 ("[w]e frequently have stated that speculation and conjecture have no place in appellate review" (internal quotation marks omitted)), cert. denied, 337 Conn. 904, 252 A.3d 364 (2021).